**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LACI SATTERFIELD, individually,
and on behalf of others similarly
situated,
        *Plaintiff-Appellant,*

v.

SIMON & SCHUSTER, INC., a New
York corporation; IPSH!NET, a
Delaware corporation aka IPSH,
        *Defendants-Appellees.*

No. 07-16356

D.C. No.
CV-06-02893-CW

OPINION

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, District Judge, Presiding

Argued and Submitted
February 11, 2009—San Francisco, California

Filed June 19, 2009

Before: John T. Noonan, David R. Thompson and
N. Randy Smith, Circuit Judges.

Opinion by Judge N.R. Smith

## COUNSEL

John G. Jacobs, The Jacobs Law Firm, Chtd., Chicago, Illinois, for the plaintiff-appellant.

Peter L. Winik and Barry J. Blonien, Latham & Watkins LLP, Washington, DC, for the defendants-appellees.

## OPINION

N.R. SMITH, Circuit Judge:

Laci Satterfield, individually and on behalf of those similarly situated, appeals the district court's grant of summary

judgment in favor of Simon & Schuster, Inc. and ipsh!net Inc. ("ipsh!").[1] Satterfield alleges a violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, arising after Satterfield received an unsolicited text message. We hold that there is a genuine issue of material fact concerning whether the equipment used by Simon & Schuster has the capacity to both (1) store or produce numbers to be called using a random or sequential number generator and (2) to dial such numbers. Giving deference to the Federal Communications Commission ("FCC"), *see Chevron v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984), we hold that it is reasonable to interpret "call" under the TCPA to include both voice calls and text messages. We also conclude that Simon & Schuster is not an affiliate or brand of Nextones and therefore Satterfield did not expressly consent to receive this text message from Simon & Schuster. Accordingly, we reverse the district court and remand.

## I.   FACTS AND PROCEDURAL HISTORY

Satterfield brought this action against Simon & Schuster for text messaging an advertisement to a cellular phone she owned in violation of the TCPA. Satterfield received this text message after she became a registered user of Nextones.com ("Nextones") (not a defendant in this case). Satterfield joined Nextones at the request of her minor son in order to receive a free ringtone. In order for Satterfield to get the free ringtone for her son, she had to fill out a form which read:

### Nextones Member Sign Up

Sign up to become a registered user of Nextones

---

[1]When referred to collectively, Simon & Schuster and ipsh! are referred to as "Simon & Schuster."

today, for free! There is absolutely **no cost** involved in registering!

Satterfield then provided her son's initials and first three letters of his last name, her email address, zip code, phone number, and account information. The form also provided a check box that was followed by:

> Yes! I would like to receive promotions from Nextones affiliates and brands. Please note, that by declining you may not be eligible for our FREE content.

> By checking Submit, you agree that you have **read and agreed** to the *Terms and Conditions*.

Satterfield checked the box opposite the "Yes!" and pressed the submit button.

Subsequently, on January 18, 2006 at 12:30 a.m., Satterfield received a text message (on the phone registered with Nextones.com) from Simon & Schuster advertising its publication of a novel by Stephen King. The message stated:

"The next call you take may be your . . . Join the Stephen King VIP Mobile Club at www.cellthebook.com. RplySTOP2OptOut. PwdByNexton."

Simon & Schuster sent the text message as part of its promotional campaign for the Steven King novel *Cell*. Simon & Schuster outsourced the promotional campaign to ipsh!, who obtained a list of 100,000 individuals' cell phone numbers from Mobile Information Access Company (MIA). MIA was Nextones' exclusive agent for licensing the numbers of Nextones subscribers.

MIA provided ipsh! with electronic plain text or Excel files containing the list of 100,000 mobile numbers of Nextones

subscribers. ipsh!'s programmers then imported the list into a database and entered the relevant information for the promotional messages into the database, where they were stored until they were programmed to be sent to the intended recipients. ipsh! then sent the file to mBlox, Inc., an "aggregator," or mobile transaction networking services company. mBlox handled the actual transmission of the text messages to the wireless carriers. After receiving some complaints about the promotional text message, mBlox refused to send out any more messages on ipsh!'s behalf.

Satterfield filed suit, alleging a violation of the TCPA for Simon & Schuster's transmission, of this unsolicited text message to her and other class members' cell phones, by an Automatic Telephone Dialing System ("ATDS"). Simon & Schuster moved for summary judgment, arguing that (1) it had not used an ATDS, (2) Satterfield had not received a "call" within the meaning of the TCPA, and (3) Satterfield had consented to the message and had not been charged for its receipt. The district court granted the summary judgment holding that (1) Simon & Schuster and ipsh! had not used an ATDS and (2) Satterfield had consented to receiving the message. The district court did not rule on Simon & Schuster's argument that a text message is not a "call" under the TCPA. Accordingly, judgment was entered for Simon & Schuster. Satterfield timely filed this appeal.

## II.  DISCUSSION

**[1]** Summary judgment is appropriate when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the nonmoving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56.

The TCPA provides:

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

. . .

(iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call;

47 U.S.C. § 227(b)(1)(A)(iii).

(a) Definitions

As used in this section—

(1) The term "automatic telephone dialing system" means equipment which has the capacity—

(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and

(B) to dial such numbers

47 U.S.C. § 227(a)(1).

Reviewing the district court's grant of summary judgment de novo, *Nolan v. Heald College*, 551 F.3d 1148, 1153 (9th Cir. 2009), we hold that the district court erred, because (A)

there was a disputed issue of material fact as to whether the system Simon & Schuster used was an ATDS; (B) the text message was a "call" within the meaning of the TCPA; and (C) Satterfield did not consent to the receipt of such a message, because Simon & Schuster is not an affiliate or brand of Nextones.

## A. The ATDS

The district court erred in holding that there was no genuine and disputed issue of material fact as to whether the system Simon & Schuster used was an ATDS. The district court focused its analysis on whether the equipment used by Simon & Schuster stored, produced, or called numbers "using a random or sequential number generator." The district court even noted that "the parties' dispute centers on the phrase 'using a random or sequential number generator.' " With this as its focus, the district court held that "the equipment here does not store, produce or call randomly or sequentially generated telephone numbers, the Court grants summary judgment in the Defendants' favor: the equipment at issue is not an automatic telephone dialing system under the TCPA." We find that the district court focused its analysis on the wrong issue in its determination of what constitutes an ATDS.

In construing the provisions of a statute, we first look to the language of the statute to determine whether it has a plain meaning. *McDonald v. Sun Oil Co.*, 548 F.3d 774, 780 (9th Cir. 2008). "The preeminent canon of statutory interpretation requires us to presume that [the] legislature says in a statute what it means and means in a statute what it says there. Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *Id.* (quoting *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (internal quotation marks omitted)). Reviewing this statute, we conclude that the statutory text is clear and unambiguous.

**[2]** When evaluating the issue of whether equipment is an ATDS, the statute's clear language mandates that the focus

must be on whether the equipment has the *capacity* "to store or produce telephone numbers to be called, using a random or sequential number generator." Accordingly, a system need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it. Since the district court did not focus its decision on this issue, we must then review the record to determine if summary judgment may issue. At the hearing, counsel for the parties suggested that the record was not clear regarding that issue. We agree.

Reviewing the record, we find that there is a genuine issue of material fact with regard to whether this equipment has the requisite capacity. Satterfield's expert, Randall A. Snyder, opined that this telephone system "stored telephone numbers to be called and subsequently dialed those numbers automatically and without human intervention . . . [t]he use of stored numbers, randomly generated numbers or sequentially generated numbers used to automatically originate calls is a technical difference without a perceived distinction . . . ." He later opined that "[t]his is the primary automated function within the platform that constructs text messages and individually enters them into a message queue for subsequent delivery to the cellular networks . . . . The cellular phone numbers residing in the cellular phone number database for the specific application are applied in sequence, as they are stored in the database, to serve as the destination cellular phone number for each individual text message." However, Snyder never specifically declared that this equipment had the requisite capacity. On the other hand, Jay Emmet, President of mBlox (company responsible for the actual transmission of the text messages and a nonparty in this case), testified that the system used was not capable of sending messages to telephone numbers not fed to the system by mBlox, nor was it capable of generating random or sequential telephone numbers.

**[3]** Therefore, this limited record demonstrates that there is a genuine issue of material fact whether this telephone system

has the requisite capacity to be considered an ATDS under the TCPA. Given the conflicting testimony and this limited record, we hold that summary judgment on this issue was inappropriate. We therefore remand to the district court to determine whether the equipment used by Simon & Schuster had the requisite capacity.

## B.    The Call

The district court did not address Simon & Schuster's argument that sending a text message does not fall within the Act, because a text message is not a "call" within the meaning of the TCPA. Reviewing this issue, we hold that a text message is a "call" within the meaning of the TCPA.

[4] The TCPA makes it unlawful "to make any call" using an ATDS. 47 U.S.C. § 227(b)(1)(A). While the TCPA does not define "call," the FCC has explicitly stated that the TCPA's prohibition on ATDSs "encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls . . . ." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd. 14014, 14115 (July 3, 2003) (hereinafter "2003 Report and Order"). The FCC subsequently confirmed that the "prohibition on using automatic telephone dialing systems to make calls to wireless phone numbers applies to text messages (e.g., phone-to-phone SMS), as well as voice calls." *In the Matter of Rules and Regulations Implementing the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003; Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 19 FCC Rcd. 15927, 15934 (FCC August 12, 2004). In the Notice of Proposed Rulemaking of the CAN-SPAM Act, the FCC also noted "that the TCPA and Commission rules that specifically prohibit using automatic telephone dialing systems to call wireless numbers already apply to any type of call, including both voice and text calls." *Id.* at 15933. Therefore, the FCC has determined that a text message falls

within the meaning of "to make any call" in 47 U.S.C. § 227(b)(1)(A).²

In *Chevron*, the Supreme Court set forth a two-step test for judicial review of administrative agency interpretations of federal law. We give broad deference to an agency's interpretation meeting this test. First, we must determine "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. Second, if a statute is silent or ambiguous with respect to the issue at hand, we must defer to the agency so long as "the agency's answer is based on a permissible construction of the statute." *Id.* at 843. An agency's interpretation is permissible, unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844.

**[5]** While *Chevron* only considered formal notice-and-comment rulemaking, the Supreme Court in *United States v. Mead Corp.,* 533 U.S. 218 (2001)*,* clarified that "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Wilderness Soc. v. U.S. Fish & Wildlife*, 353 F.3d 1051, 1060 (9th Cir. 2003) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)). "Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent." *Mead*, 533 U.S. at 227. Those administra-

---

²The FCC's website also indicates that the use of an ATDS may not be used to contact numbers assigned to: "a paging service, wireless phone service (including both voice calls and text messages), or other commercial mobile radio service." Unwanted Telephone Marketing Calls, http://www.fcc.gov/cgb/consumerfacts/tcpa.html.

tive decisions not meeting these standards may still be given deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *Mead*, 533 U.S. at 228.

**[6]** Congress has delegated the FCC with the authority to make rules and regulations to implement the TCPA. *See* 47 U.S.C. § 227(b)(2). Pursuant to this authority, the FCC stated, "We affirm that under the TCPA, it is unlawful to make *any call* using an automatic telephone dialing system or an artificial or prerecorded message to any wireless telephone number. Both the statute and our rules prohibit these calls, with limited exceptions, 'to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other common carrier service, or any service for which the called party is charged.' This encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls, provided the call is made to a telephone number assigned to such service." 2003 Report and Order at 14115. This interpretation has the force of law and is therefore entitled to *Chevron* deference if (1) "call" is not defined by the TCPA and (3) if the FCC's interpretation of the statute is reasonable. *Chevron*, 467 U.S. at 843-44.

### 1. Call is not defined by the TCPA.

The first step under the *Chevron* analysis is to determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If it has, Congress's intent must be enforced and that is the end of the matter. "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* at 843 n.9. "It is well settled that the starting point for interpreting a statute is the language of the statute itself." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987) (internal citation and quotation marks omitted). "[U]nless otherwise defined, words will be interpreted as tak-

ing their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979)). Another "fundamental canon of statutory construction [is] that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989)). We may also read statutory terms in light of the purpose of the statute. *Wilderness Soc'y*, 353 F.3d at 1060. If, under theses canons, or other traditional means of determining Congress's intentions, we are able to determine that Congress spoke clearly, we need not look to the FCC's interpretations. *See id.* at 1061.

[7] The precise language at issue here is what did Congress intend when it said "to make any call" under the TCPA. Utilizing the aforementioned canons of statutory construction, we look to the ordinary, contemporary, and common meaning of the verb "to call." Webster's defines "call" in this context[3] as "to communicate with or try to get into communication with a person by a telephone." Webster's Third New International Dictionary 318 (2002). This definition suggests that by enacting the TCPA, Congress intended to regulate the use of an ATDS to communicate or try to get into communication with a person by a telephone. However, this law was enacted in 1991 when text messaging was not available.

[8] We also consider the purposes of the TCPA. The TCPA was enacted to "protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited,

---

[3]The word "call" has several plain and ordinary meanings. *See generally* Webster's Third New Int'l Dictionary 317-18 (2002). Given that the TCPA was enacted to regulate the receipt of automated telephone calls, Congress used the word "call" to refer to an attempt to communicate by telephone. *See United States v. Amer. Trucking Assoc.*, 310 U.S. 534, 542-43 (1940) (when words of a statute are susceptible to more than one meaning, courts are to interpret them in a manner which is reasonable given the subject matter of the statute and its purpose).

automated telephone calls to the home and to facilitate inter-state commerce by restricting certain uses of facsimile machines and automatic dialers." S. Rep. No. 102-178, at 1 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1968. The TCPA was enacted in response to an increasing number of consumer complaints arising from the increased number of telemarketing calls. *See id.* at 2. The consumers complained that such calls are a "nuisance and an invasion of privacy." *See id.* The purpose and history of the TCPA indicate that Congress was trying to prohibit the use of ATDSs to communicate with others by telephone in a manner that would be an invasion of privacy. We hold that a voice message or a text message are not distinguishable in terms of being an invasion of privacy.

**[9]** The language and purpose of the TCPA support the conclusion that the use of an ATDS to make any call, regardless of whether that call is communicated by voice or text, is prohibited. However, we recognize that Congress could not have spoken clearly to this issue in 1991 when the statute was enacted. Therefore, we conclude that the statute is silent as to whether a text message is a call within the Act.

### 2. The FCC's interpretation of "call" is reasonable.

"When a statute is ambiguous or leaves key terms undefined, a court must defer to the federal agency's interpretation of the statute, so long as such interpretation is reasonable." *Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1056 (9th Cir. 2008) (citing *Metrophones Telecomms., Inc. v. Global Crossing Telecomms., Inc.*, 423 F.3d 1056, 1067 (9th Cir. 2005). Because the TCPA is silent to the issue at hand, we must defer to the agency so long as the agency's interpretation "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. An agency's interpretation of a statute is permissible, unless "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844.

**[10]** The FCC's interpretation of 47 U.S.C. § 227(b)(1)(A) is consistent with the dictionary's definition of call in that it

is defined as "to communicate with or try to get into communication with a person by telephone." It is undisputed that text messaging is a form of communication used primarily between telephones. The FCC's interpretation is also consistent with the purpose of the TCPA—to protect the privacy interests of telephone subscribers. Further, nothing in the record indicates that such an interpretation is "arbitrary, capricious, or manifestly contrary to the statute." Accordingly, we find that the FCC's interpretation of the TCPA is reasonable, and therefore afford it deference to hold that a text message is a "call" within the TCPA.

## C.   Express Consent

[11] Finally, the district court erred in granting summary judgment based upon Satterfield expressly consenting to receiving the message. While the TCPA exempts those calls "made with the prior express consent of the called party," 47 U.S.C. § 227(b)(1)(A), no express consent was given in this case. Express consent is "[c]onsent that is clearly and unmistakably stated." Black's Law Dictionary 323 (8th ed. 2004). Satterfield solely consented to receiving promotional material from Nextones or their affiliates and brands. The term "affiliate" carries its own, independent legal significance. "Affiliate refers to a 'corporation that is related to another corporation by shareholdings or other means of control . . . .' " *Delaware Ins. Guar. Ass'n v. Christiana Care Health Servs., Inc.*, 892 A.2d 1073, 1077 (Del. 2006) (quoting Black's Law Dictionary 59 (7th ed. 1999)). The plain and ordinary meaning of "affiliate"[4] supports this definition as "a company effectively controlled by another or associated with others under common ownership or control." Webster's Third New International Dictionary 35 (2002). The record confirms that Nextones neither owns nor controls Simon & Schuster, nor can Nextones

---

[4]*See, e.g.*, *McHugh v. United Service Auto. Ass'n*, 164 F.3d 451, 455 (9th Cir. 1999) (unless contract terms are specifically different than common usage of the terms, comman usage will be adopted.)

be considered a Simon & Schuster subsidiary. In fact, the record shows no direct contractual relationship between Nextones and Simon & Schuster.[5]

The district court also erred in granting summary judgment based on Satterfield's consent to receive promotional materials by Nextones' brands. The district court found there was "no dispute of fact that the promotional text message at issue was identified with a Nextones brand." The district court's conclusion is based solely on the fact that the message contained the phrase "PwdbyNexton."[6] We do not agree. Under this logic, any company sending a text message could simply include "PwdbyNexton" and it would be considered a "brand" of Nextones. Brand is not defined in the contract, therefore we look to its plain and ordinary meaning. Brand is commonly defined as "a class of goods identified as being the product of a single firm or manufacturer." Webster's Third New International Dictionary 268 (2002). The message was a product of Simon & Schuster, not Nextones. Nextones's only role in this case was simply supplying the numbers to MIA, who in turn supplied the numbers to ipsh!. The record also shows no agreement between Nextones and Simon & Schuster. Therefore, Simon & Schuster is not a Nextones Brand.

**[12]** Thus, Satterfield's consent to receive promotional material by Nextones and its affilliates and brands cannot be read as consenting to the receipt of Simon & Schuster's promotional material. Accordingly, the district court erred in granting summary judgment.

---

[5]Nextones' own website explains that its affiliates include other companies who "sell mobile content such as ringtones and graphics." Simon & Schuster does not fall within Nextones' own definition.

[6]The district court assumes that, without any explanation, "PwdbyNexton" means "Powered by Nextones."

### III. CONCLUSION

Summary judgment was inappropriate, because there is a genuine issue of material fact concerning whether the equipment utilized by Simon & Schuster has the requisite capacity under the TCPA. The FCC has reasonably interpreted "call" under the TCPA to encompass both voice calls and text calls. This interpretation is reasonable and is therefore entitled to deference. *See Chevron*, 467 U.S. at 843-44. Satterfield did not consent to receive the text message. We therefore reverse and remand.

**REVERSED** and **REMANDED.**