**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOSE GOMEZ, individually and on behalf of a class of similarly situated individuals, *Plaintiff-Appellant*, v. CAMPBELL-EWALD COMPANY, *Defendant-Appellee*. | No. 13-55486 D.C. No. 2:10-cv-02007-DMG-CW OPINION |

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, District Judge, Presiding

Argued and Submitted
July 11, 2014—Pasadena, California

Filed September 19, 2014

Before: Fortunato P. Benavides,[*] Kim McLane Wardlaw,
and Richard R. Clifton, Circuit Judges.

Opinion by Judge Benavides

---

[*] The Honorable Fortunato P. Benavides, Senior Circuit Judge for the U.S. Court of Appeals for the Fifth Circuit, sitting by designation.

## SUMMARY[**]

### Telephone Consumer Protection Act

The panel vacated the district court's summary judgment in favor of the defendant on personal and putative class claims under the Telephone Consumer Protection Act.

The plaintiff alleged that the defendant company instructed or allowed a third-party vendor to send unsolicited text messages on behalf of the United States Navy, with which the defendant had a marketing contract.

The panel held that pursuant to *Diaz v. First Am. Home Buyers Prot. Corp.*, 732 F.3d 948 (9th Cir. 2013), the plaintiff's individual claim was not mooted by his refusal to accept a settlement offer under Federal Rule of Civil Procedure 68. Pursuant to *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081 (9th Cir. 2011), the putative class claims were not mooted where the plaintiff rejected the settlement offer before he moved for class certification. The panel concluded that *Pitts* and *Diaz* were not clearly irreconcilable with *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523 (2013) (addressing collective action brought pursuant to Fair Labor Standards Act).

The panel held that 47 U.S.C. § 227(b)(1)(A)(iii), which restricts unsolicited text messaging, does not violate the First Amendment.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that a defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller.

Finally, the panel held that the defendant was not entitled to derivative sovereign immunity. It remanded the case for further proceedings consistent with this opinion.

---

**COUNSEL**

Evan M. Meyers (argued), McGuire Law, P.C., Chicago, Illinois; Michael J. McMorrow, McMorrow Law, P.C., Chicago, Illinois; and David C. Parisi, Parisi & Havens LLP, Sherman Oaks, California, for Plaintiff-Appellant.

Laura A. Wytsma (argued), Michael L. Mallow, Christine M. Reilly, and Meredith J. Siller, Loeb & Loeb LLP, Los Angeles, California, for Defendant-Appellee.

---

**OPINION**

BENAVIDES, Circuit Judge:

Plaintiff Jose Gomez appeals adverse summary judgment on personal and putative class claims brought pursuant to the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(A)(iii) (2012). Gomez alleges that the Campbell-Ewald Company instructed or allowed a third-party vendor to send unsolicited text messages on behalf of the United States Navy, with whom Campbell-Ewald had a marketing contract.

Because we conclude that Campbell-Ewald is not entitled to immunity, and because we find no alternate basis upon which to grant its motion for summary judgment, we vacate the judgment and remand to the district court.

I.

The facts with respect to Gomez's personal claim are largely undisputed. On May 11, 2006, Gomez received an unsolicited text message stating:

> Destined for something big? Do it in the Navy. Get a career. An education. And a chance to serve a greater cause. For a FREE Navy video call [number].

The message was the result of collaboration between the Navy and the Campbell-Ewald Company,[1] a marketing consultant hired by the Navy to develop and execute a multimedia recruiting campaign. The Navy and Campbell-Ewald agreed to "target" young adults aged 18 to 24, and to send messages only to cellular users that had consented to solicitation. The message itself was sent by Mindmatics, to whom the dialing had been outsourced. Mindmatics was responsible for generating a list of phone numbers that fit the stated conditions, and for physically transmitting the messages. Neither the Navy nor Mindmatics is party to this suit.

In 2010, Gomez filed the present action against Campbell-Ewald, alleging a single violation of 47 U.S.C. § 227(b)(1)(A)(iii), which states:

---

[1] The company is now known as Lowe Campbell Ewald.

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice— . . .

(iii) to any telephone number assigned to a paging service [or] cellular telephone service . . . .

Gomez contends that he did not consent to receipt of the text message. He also notes that he was 40 years old at the time he received the message, well outside of the Navy's target market. It is undisputed that a text message constitutes a call for the purposes of this section. *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 952 (9th Cir. 2009) ("[W]e hold that a text message is a 'call' within the meaning of the TCPA."). In addition to seeking compensation for the alleged violation of the TCPA, Gomez also sought to represent a putative class of other unconsenting recipients of the Navy's recruiting text messages.

After a 12(b)(6) motion to dismiss was denied, Campbell-Ewald tried to settle the case. Campbell-Ewald offered Gomez $1503.00 per violation, plus reasonable costs, but Gomez rejected the offer by allowing it to lapse in accordance with its own terms.

Campbell-Ewald then moved to dismiss the case under Rule 12(b)(1), arguing that Gomez's rejection of the offer mooted the personal and putative class claims. After the court denied the motion, Campbell-Ewald moved for summary judgment, seeking derivative immunity under *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940). In opposition to the summary judgment motion, Gomez presented evidence that the Navy intended the messages to be sent only to individuals who had consented or "opted in" to receive messages like the recruiting text. A Navy representative testified that Campbell-Ewald was not authorized to send texts to individuals who had not opted in. The district court ultimately granted the motion, holding that Campbell-Ewald is "immune from liability under the doctrine of derivative sovereign immunity." *Gomez v. Campbell-Ewald Co.*, No. CV 10-2007 DMG CWX, 2013 WL 655237, at \*6 (C.D. Cal. Feb. 22, 2013). Gomez filed a timely appeal, arguing that the *Yearsley* doctrine is inapplicable.

This Court reviews summary judgment *de novo*, affirming only where there exists no genuine dispute of material fact. *Satterfield*, 569 F.3d at 950; *see also* FED. R. CIV. P. 56(a). We are free to affirm "on any basis supported by the record." *Gordon v. Virtumundo, Inc*., 575 F.3d 1040, 1047 (9th Cir. 2009).

## II.

We begin with jurisdiction. Upon Gomez's timely appeal, Campbell-Ewald filed a motion to dismiss for lack of jurisdiction, arguing that the personal and putative class claims were mooted by Gomez's refusal to accept the settlement offer. We denied that motion without prejudice, and now reject Campbell-Ewald's argument on the merits.

Gomez's individual claim is not moot.  Campbell-Ewald argues that "whether or not the class action here is moot," the individual claim was mooted by Gomez's rejection of the offer.  The company is mistaken.  Although this issue was unsettled until recently, we have now expressly resolved the question.  "[A]n unaccepted Rule 68 offer that would fully satisfy a plaintiff's claim is insufficient to render the claim moot." *Diaz v. First Am. Home Buyers Prot. Corp*., 732 F.3d 948, 950 (9th Cir. 2013).  Because the unaccepted offer alone is "insufficient" to moot Gomez's claim, and as Campbell-Ewald identifies no alternate or additional basis for mootness, the claim is still a live controversy.

Similarly, the putative class claims are not moot.  We have already explained that "an unaccepted Rule 68 offer of judgment—for the full amount of the named plaintiff's individual claim and made before the named plaintiff files a motion for class certification—does not moot a class action." *Pitts v. Terrible Herbst, Inc*., 653 F.3d 1081, 1091–92 (9th Cir. 2011).  Like the *Pitts* plaintiff, Gomez rejected the offer before he moved for class certification.  Gomez's rejection therefore does not affect any class claims.

Campbell-Ewald recognizes that it is asking this panel to depart from these precedents.  Yet it is well settled that we are bound by our prior decisions. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).  Although there is an exception for precedents that have been overruled, that exception applies only where "the relevant court of last resort [has] undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Ibid*.  Campbell-Ewald argues that *Pitts* and *Diaz* are clearly irreconcilable with the Supreme Court's recent decision in *Genesis Healthcare Corp. v. Symczyk*, —

U.S. —, 133 S. Ct. 1523 (2013). Campbell-Ewald overstates the relevance of that case, which involved a collective action brought pursuant to § 16(b) of the Fair Labor Standards Act. *Id.* at 1526–27. The defendant argued that the case was mooted by the plaintiff's rejection of a settlement offer of complete relief. *Id*. at 1528. The Supreme Court ultimately agreed, first accepting the lower court's conclusion that the personal claim was moot, and then holding that the named plaintiff had "no personal interest in representing putative, unnamed claimants, nor any other continuing interest that would preserve her suit from mootness." *Id*. at 1532.

Campbell-Ewald correctly observes that *Genesis* undermined some of the reasoning employed in *Pitts* and *Diaz*. For example, the *Pitts* opinion referred to the risk that a defendant might "pick off" named plaintiffs in order to evade class litigation. 653 F.3d at 1091 (quoting *Weiss v. Regal Collections*, 385 F.3d 337, 344 (3d Cir. 2004)). The *Genesis* Court distanced itself from such reasoning, pointing out that the argument had only been used once by the high Court, and only "in dicta." 133 S. Ct. at 1532 (referring to *Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 339 (1980)). Nevertheless, courts have universally concluded that the *Genesis* discussion does not apply to class actions.[2] In fact, *Genesis* itself emphasizes that "Rule 23

---

[2] At least ten courts had expressly stated that the *Genesis* analysis does not bind courts with respect to class action claims. *E.g*., *Epstein v. JPMorgan Chase & Co.*, No. 13 Civ. 4744(KPF), 2014 WL 1133567, at *9 (S.D.N.Y. Mar. 21, 2014) ("The court agrees with Plaintiff that these [prior class action] cases were not affected by the Supreme Court's recent decision in *Genesis* . . . ."); *Knutson v. Schwan's Home Serv., Inc*., No. 3:12-cv-0964-GPC-DHB, 2013 WL 4774763, at *11 (S.D. Cal. Sept. 5, 2013) (concluding that *Pitts* was not affected by *Genesis*). We are not aware of any court that has held otherwise.

[class] actions are fundamentally different from collective actions under the FLSA" and, therefore, the precedents established for one set of cases are "inapplicable" to the other. 133 S. Ct. at 1529. Accordingly, because *Genesis* is not "clearly irreconcilable" with *Pitts* or *Diaz*, this panel remains bound by circuit precedent, and Campbell-Ewald's mootness arguments must be rejected. *Miller*, 335 F.3d at 900.

III.

Campbell-Ewald's constitutional challenge is equally unavailing. The company argues that the statute is unconstitutional either facially or as applied, but its argument relies upon a flawed application of First Amendment principles. Although the district court did not ultimately reach this issue, the record confirms that the challenge was properly raised below.

We have already affirmed the constitutionality of this section of the TCPA. *Moser v. FCC*, 46 F.3d 970, 973–74 (9th Cir. 1995). The government may impose reasonable restrictions on the time, place, or manner of protected speech, provided that the restrictions "are justified without reference to the content of the restricted speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (other citations omitted)). In analyzing the section, the *Moser* Court focused on the content-neutral statutory language. "Because nothing in the statute requires the [Federal Communications Commission] to distinguish between commercial and

noncommercial speech, we conclude that the statute should be analyzed as a content-neutral time, place, and manner restriction."[3] We then upheld the statute after finding that the protection of privacy is a significant interest, the restriction of automated calling is narrowly tailored to further that interest, and the law allows for "many alternative channels of communication." *Id.* at 974–75.

Campbell-Ewald does not contest our reasoning in *Moser*. Instead, Campbell-Ewald argues that the government's interest only extends to the protection of residential privacy, and that therefore the statute is not narrowly tailored to the extent that it applies to cellular text messages. The argument fails. First, this Court already applies the TCPA to text messages. *Satterfield*, 569 F.3d at 951–52. Second, there is no evidence that the government's interest in privacy ends at home—the fact that the statute reaches fax machines suggests otherwise. *See* 47 U.S.C. § 227(b)(1)(C). Third, to whatever extent the government's significant interest lies exclusively in residential privacy, the nature of cell phones renders the restriction of unsolicited text messaging all the more necessary to ensure that privacy. After all, it seems safe to assume that most cellular users have their phones with them when they are at home. Campbell-Ewald itself notes that in many households a cell phone *is* the home phone. In fact, recent statistics suggest that over 40% of American households now rely exclusively on wireless telephone

---

[3] 46 F.3d at 973. Campbell-Ewald does not argue that the statute is no longer content neutral insofar as some implementing regulations distinguish between commercial and noncommercial calls. *See* 47 C.F.R. § 64.1200(a)(2) (2014); *cf. Destination Ventures, Ltd. v. FCC*, 46 F.3d 54, 56 (9th Cir. 1995) (holding that the TCPA's treatment of commercial facsimile transmissions, 42 U.S.C. § 227(b)(1)(C), is a constitutionally permitted content-based restriction).

service.[4]  As a consequence, prohibiting automated calls to land lines alone would not adequately safeguard the stipulated interest in residential privacy.  For all these reasons, Campbell-Ewald's argument is without merit.

Nor does the government speech doctrine provide Campbell-Ewald with a meritorious constitutional challenge. Campbell-Ewald argues that military recruiting messages are a form of government speech afforded greater protection by the First Amendment.  Campbell-Ewald mischaracterizes the doctrine.  The government speech doctrine is a jurisprudential theory by which the federal government can regulate its own communication "without the constraint of viewpoint neutrality."  *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1017 (9th Cir. 2000), *cert. denied*, 532 U.S. 994 (2001).  For example, the First Amendment does not require the federal government to fund messages both for and against abortion. *Cf. Rust v. Sullivan*, 500 U.S. 173, 203 (1991) (upholding, under the government speech doctrine, regulations forbidding certain publicly funded doctors from endorsing abortion). Similarly, in this context, the doctrine would preclude Campbell-Ewald from demanding that the Navy create an advertising campaign that discourages military participation. The government speech doctrine is simply immaterial to the present dispute, in which the plaintiff is not advocating for viewpoint neutrality, but is instead challenging the regulation of a particular means of communication.

---

[4] *See* Karen Kaplan, *Still have a land line? 128 million don't.*, L.A. TIMES, July 8, 2014, http://www.latimes.com/science/sciencenow/la-sci-sn-wireless-only-households-in-america-20140708-story.html.

IV.

Campbell-Ewald nevertheless argues that it cannot be held liable for TCPA violations because it outsourced the dialing and did not actually make any calls on behalf of its client. *See* 47 U.S.C. § 227(b)(1)(A)(iii) (rendering it unlawful "to make any call" using an automated dialing system). Gomez, in fact, concedes that a third party transmitted the disputed messages. Even so, Campbell-Ewald's argument is not persuasive.

Although Campbell-Ewald did not send any text messages, it might be vicariously liable for the messages sent by Mindmatics. The statute itself is silent as to vicarious liability. We therefore assume that Congress intended to incorporate "ordinary tort-related vicarious liability rules." *Meyer v. Holley*, 537 U.S. 280, 285 (2003). Accordingly, "[a]bsent a clear expression of Congressional intent to apply another standard, the Court must presume that Congress intended to apply the traditional standards of vicarious liability . . . ." *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079, 1084 (C.D. Cal. 2012), *aff'd*, — F. App'x —, 2014 WL 2959160 (9th Cir. July 2, 2014) (per curiam). Although we have never expressly reached this question, several of our district courts have already concluded that the TCPA imposes vicarious liability where an agency relationship, as defined by federal common law, is established between the defendant and a third-party caller.[5]

---

[5] *Ibid*. *See also Kristensen v. Credit Payment Servs.*, No. 2:12–CV–00528-APG, — F. Supp. 2d —, 2014 WL 1256035 (D. Nev. Mar. 26, 2014); *In re Jiffy Lube Int'l Inc.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012); *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165 (N.D. Cal. 2010).

This interpretation is consistent with that of the statute's implementing agency, which has repeatedly acknowledged the existence of vicarious liability under the TCPA. The Federal Communications Commission is expressly imbued with authority to "prescribe regulations to implement the requirements" of the TCPA. 47 U.S.C. § 227(b)(2). As early as 1995, the FCC stated that "[c]alls placed by an agent of the telemarketer are treated as if the telemarketer itself placed the call." *In re Rules and Regulations Implementing the TCPA of 1991*, 10 FCC Rcd. 12391, 12397 (1995). More recently, the FCC has clarified that vicarious liability is imposed "under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In re Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 (2013). Because Congress has not spoken directly to this issue and because the FCC's interpretation was included in a fully adjudicated declaratory ruling, the interpretation must be afforded *Chevron* deference. *Metrophones Telecomms., Inc. v. Global Crossing Telecomms, Inc.*, 423 F.3d 1056, 1065 (9th Cir. 2005) (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980–85 (2005)) (other citations omitted), *aff'd*, 550 U.S. 45 (2007); *see also Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984) ("If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation." (footnote omitted)).

Campbell-Ewald concedes that the FCC already recognizes vicarious liability in this context, but argues that vicarious liability only extends to the merchant whose goods or services are being promoted by the telemarketing

campaign. Yet the statutory language suggests otherwise, as § 227(b) simply imposes liability upon "any person"—not "any merchant." *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 221 (2008) (interpreting the use of "any" as "all-encompassing"); 47 C.F.R. § 64.1200 (interpreting the phrase "any person" to reach individuals and entities). And although the FCC's 2013 ruling may emphasize vicarious liability on the part of merchants, the FCC has never stated that vicarious liability is *only* applicable to these entities.[6] Indeed, such a construction would contradict "ordinary" rules of vicarious liability, *Meyer*, 537 U.S. at 285, which require courts to consider the interaction between the parties rather than their respective identities. *See* RESTATEMENT (THIRD) OF AGENCY (2006) §§ 2.01, 2.03, 4.01 (explaining that agency may be established by express authorization, implicit authorization, or ratification).

Given Campbell-Ewald's concession that a merchant can be held liable for outsourced telemarketing, it is unclear why a third-party marketing consultant shouldn't be subject to that same liability. As a matter of policy it seems more important to subject the consultant to the consequences of TCPA infraction. After all, a merchant presumably hires a consultant in part due to its expertise in marketing norms. It

---

[6] *Dish Network*, 28 FCC Rcd. at 6574. The FCC uses the word "seller," which Campbell-Ewald construes as the merchant whose goods or services are featured in the telemarketing campaign. The FCC actually defines seller as an "entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." *See* 47 C.F.R § 64.1200(f)(9). We need not determine whether Campbell-Ewald constitutes a seller under this definition, as we conclude that vicarious liability turns on the satisfaction of relevant standards of agency, irrespective of a defendant's nominal designation.

makes little sense to hold the merchant vicariously liable for a campaign he entrusts to an advertising professional, unless that professional is equally accountable for any resulting TCPA violation. In fact, Campbell-Ewald identifies no case in which a defendant was exempt from liability due to the outsourced transmission of the prohibited calls.

Moreover, our own precedent belies any argument that liability is not possible. In our seminal case regarding text messages and the TCPA, we allowed a case to proceed against an analogous marketing consultant who was not "responsible for the actual transmission of the text messages." *See Satterfield*, 569 F.3d at 951. In *Satterfield*, a publisher had instructed a marketing consultant to create a text message campaign advertising a new Stephen King novel. *Id.* at 949. The consultant in turn outsourced the recipient selection and message transmission to two other subcontractors. *Id*. A recipient sued both the publisher and the marketing consultant for alleged violations of the TCPA. *Id.* at 950. The district court entered summary judgment in favor of both defendants, holding that the cellular user had consented to receive advertisements when it signed its cellular service contract. *Id.* We ultimately reversed and remanded the case, holding (*inter alia*) that the cellular service agreement did not constitute "express consent" to receive the advertisement in dispute. *Id.* at 955. So although we did not explain the basis of the defendants' potential liability, we implicitly acknowledged the existence of that basis. The present case affords an opportunity to clarify that a defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller.

Before moving on, we should note that Gomez asks us to endorse another potential source of liability by holding that direct liability applies where a third party is "closely involved" in the placing of the calls. Because the facts are not yet developed, the present case does not require such a determination. We therefore leave that question for another day. *See United States v. Manning*, 527 F.3d 828, 837 n.8 (9th Cir. 2008) ("[W]e simply express no view on issues unnecessary to this [decision]." (citation omitted)).

V.

Finally, we turn to the legal theory underlying the district court's decision. The court entered summary judgment after concluding that Campbell-Ewald is exempt from liability under *Yearsley*, 309 U.S. 18. Gomez contends that *Yearsley* is outdated and inapposite, and that the district court should have applied the standard articulated in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988). The availability of these defenses is a question of law that we review *de novo*. *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1000 (9th Cir. 2008).

After reviewing the relevant law, we agree with Gomez that *Yearsley* is not applicable. *Yearsley* established a narrow rule regarding claims arising out of property damage caused by public works projects. The dispute involved erosion caused by efforts to render the Missouri River more navigable. *Yearsley*, 309 U.S. at 19. The Court reasoned that if—as alleged—the contractor's work was in accordance with express Congressional directive and resulted in an unconstitutional taking of property, "the Government has impliedly promised to compensate the plaintiffs and has afforded a remedy for its recovery by a suit in the Court of

Claims." *Id.* at 21–22 (citing 28 U.S.C. § 250 (1940)) (other citations omitted). As a consequence, there was an adequate remedy available and no need for action against the private contractor. *Id.* at 22.

It seems clear that the reasoning employed by the *Yearsley* Court is not relevant here. Gomez's claims do not implicate a constitutional "promise to compensate" injured plaintiffs such that an alternate remedy exists. Nor does the case belong in some other venue. *Cf. Myers v. United States*, 323 F.2d 580, 583 (9th Cir. 1963) (remanding under *Yearsley* for transfer to Court of Claims). Instead, Congress has expressly created a federal cause of action affording individuals like Gomez standing to seek compensation for violations of the TCPA. In the seventy-year history of the *Yearsley* doctrine, it has apparently never been invoked to preclude litigation of a dispute like the one before us. This Court, in particular, has rarely allowed use of the defense, and only in the context of property damage resulting from public works projects.

In its brief discussion, the district court did not explain its decision to apply *Yearsley* to the facts and issues at bar. The cases cited by the court do not support such an interpretation.[7] At oral argument, we asked Campbell-Ewald to name any authority that might justify the application of *Yearsley* to the facts of this case. Campbell-Ewald responded by pointing to a recent Fifth Circuit decision dismissing a class action under

---

[7] *See Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 204–07 (5th Cir. 2009) (applying *Yearsley* in traditional public works context); *Butters v. Vance Int'l Inc.*, 225 F.3d 462, 466 (4th Cir. 2000) (adjudicating immunity under the Foreign Sovereign Immunity Act); *Myers*, 323 F.2d at 583 (applying *Yearsley* to property loss resulting from highway construction).

*Yearsley*. *See Ackerson*, 589 F.3d 196. Yet that case—like *Yearsley* itself—involved allegations of property damage resulting from dredging work undertaken to improve the nation's waterways. *Id*. at 202–03 (listing allegations that the United States and its contractors had irreparably damaged Louisiana's coastline and wetlands in the 1960s, ultimately contributing to the widespread loss of property during Hurricane Katrina). So while the Fifth Circuit's decision may rebut Gomez's argument that *Yearsley* is stale precedent, it does not warrant application of the doctrine to the present dispute.

Nor does the *Boyle* pre-emption doctrine provide Campbell-Ewald with a relevant defense. The doctrine precludes state claims where the imposition of liability would undermine or frustrate federal interests. *See Nielsen v. George Diamond Vogel Paint Co.*, 892 F.2d 1450, 1454 (9th Cir. 1990) (explaining that the *Boyle* standard is used to determine when "federal law should displace state law"). *Boyle* involved a wrongful death action brought under Virginia law against a government contractor that had supplied a helicopter to the United States military. *See* 487 U.S. at 502. After a jury returned a verdict in favor of the plaintiffs, the Fourth Circuit reversed, holding that liability was precluded in part by the federal interest inherent in military decisions. *Id.* at 503, 510. The Supreme Court agreed, explaining that when "an area of uniquely federal interest" is implicated by a federal purchase, state law is displaced where "a significant conflict exists between an identifiable federal policy or interest and the operation of state law, or the application of state law would frustrate specific objectives of federal legislation . . . ." *Id.* at 507 (internal brackets, quotation marks, and citations omitted). The Court then remanded after establishing a rule by which

courts should determine whether a specific contractor is acting pursuant to a military contract such that the defense is available. *Id.* at 512.

Although *Boyle* in effect created a defense for some government contractors, it is fundamentally a pre-emption case. The *Boyle* Court established two related rules: (1) a general rule whereby state claims may be pre-empted by federal law, and (2) a specific rule whereby certain military contractors may be exempt from state tort liability in furtherance of that pre-emption. 487 U.S. at 507–08, 512. In arguing that *Boyle* governs here, Gomez overlooks the pre-emption predicate, assuming that *Boyle* represents a general grant of immunity for government contractors. Yet *Boyle* itself includes footnotes emphasizing the displacement question and indicating that it should not be construed as broad immunity precedent. *Id.* at 505 n.1, 508 n.3. We have already clarified this point, explaining that *Boyle* "is directed toward deciding the extent to which federal law should displace state law with respect to the liability of a military contractor." *Nielsen*, 892 F.2d at 1454. Accordingly, although *Boyle* may apply more broadly than to the facts of that case alone, that broader applicability is rooted in pre-emption principles and not in any widely available immunity or defense.

Returning to the present case, Gomez brings a claim under federal law, so pre-emption is simply not an issue. The *Boyle* doctrine is thus rendered inapposite. Even Campbell-Ewald—notwithstanding a vested interest in maintaining every possible means of exoneration—admits that a *Boyle* defense is not permissible here. Because the defendant does not assert a *Boyle* defense, we need not belabor the present

discussion—we accept Campbell-Ewald's concession that *Boyle* is not relevant.

Campbell-Ewald contends that a new immunity for service contractors was espoused by the Supreme Court in *Filarsky v. Delia*, — U.S. —, 132 S. Ct. 1657 (2012). Yet the Court did not establish any new theory, and although the *Filarsky* discussion does include a broad reading of the qualified immunity doctrine, *id.* at 1667–68, that doctrine is not implicated by this case. *Filarsky* involved alleged constitutional violations brought pursuant to 42 U.S.C. § 1983. *See id.* at 1661. The Supreme Court granted certiorari to resolve a dispute as to whether one of the defendants—an attorney contracted by municipal government—was eligible for the qualified immunity afforded to his city-employed colleagues. *Id.* at 1660–61. To determine the scope of the doctrine, the Court examined "the 'general principles of tort immunities and defenses' applicable at common law." *Id.* at 1662 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976)). When the examination revealed that part-time and lay officials had been granted immunity throughout the nineteenth century, *id.* at 1665, the Court concluded that the contractor was properly entitled to the same qualified immunity enjoyed by his publicly employed counterparts.

*Filarsky* has little to offer Campbell-Ewald. The decision is applicable only in the context of § 1983 qualified immunity from personal tort liability. *See, e.g.*, *ibid*. ("[I]mmunity under § 1983 should not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis."). Moreover, the Court afforded immunity only after tracing two hundred years of precedent. Here, not only do we lack decades or centuries of

common law recognition of the proffered defense, we are aware of *no* authority exempting a marketing consultant from analogous federal tort liability.

Nor are we persuaded that we should establish the novel immunity asserted by defendants. As the Supreme Court has recognized, immunity "comes at a great cost." *Westfall v. Erwin*, 484 U.S. 292, 295 (1988), *superseded by statute on other grounds*, Pub. L. No. 100-694, 102 Stat. 4563 (1988), codified at 28 U.S.C. § 2679(d), *as recognized in Adams v. United States*, 420 F.3d 1049, 1052 (9th Cir. 2005). Where immunity lies, "[a]n injured party with an otherwise meritorious tort claim is denied compensation," which "contravenes the basic tenet that individuals be held accountable for their wrongful conduct." *Westfall*, 484 U.S. at 295. Accordingly, immunity must be extended with the utmost care. The record contains sufficient evidence that the text messages were contrary to the Navy's policy permitting texts only to persons who had opted in to receive them. Consequently, we decline the invitation to craft a new immunity doctrine or extend an existing one.

## VI.

As explained herein, Campbell-Ewald's four arguments in support of summary judgment each fail. And because the motion was based on pure questions of law, we were not briefed on the factual predicates of liability. Campbell-Ewald has therefore not carried its burden to demonstrate an absence of material fact or to show that it is otherwise "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

Accordingly, we VACATE the district court's order and remand the case for further proceedings consistent with this opinion.

**VACATED and REMANDED.**

The costs shall be taxed against the Defendant-Appellee.