**Shannon SMITH, individually and on behalf of all others similarly situated, Plaintiff,**

v.

**BLUE SHIELD OF CALIFORNIA LIFE & HEALTH INSURANCE COMPANY, Defendant.**

**Case No.: SACV 16–00108–CJC(KESx)**

United States District Court, C.D. California, Southern Division.

Signed 01/13/2017

James T. Hannink, Zachariah Paul Dostart, Dostart Hannink and Coveney LLP, La Jolla, CA, for Plaintiff.

Charles L. Sweeris, Blue Shield of California, San Francisco, CA, Jay T. Ramsey, Valerie Elizabeth Alter, Fred R. Puglisi, Sheppard Mullin Richter and Hampton LLP, Los Angeles, CA, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE

### I. INTRODUCTION

Plaintiff Shannon Smith brings this case against Defendant California Physicians' Service, d/b/a Blue Shield of California ("Blue Shield")[1] alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. (Dkt. 1 Ex. A (Complaint originally filed in Orange County Superior Court and removed by Blue Shield to this Court).) Plaintiffs claim is brought on behalf of herself and all others who received an automated, prerecorded telephone call on December 3, 2015, from Blue Shield regarding renewal of health insurance for 2016. (Id. ¶ 6.) Before the Court is Blue Shield's motion for summary judgment. (Dkt. 46 [Motion, hereinafter "Mot."].) For the following reasons, the motion is GRANTED.

### II. BACKGROUND

Plaintiff completed an application for health coverage for her family through Covered California for insurance provided by Blue Shield. (Dkt. 46-7 Ex. J at 7–8; Dkt. 68 at 12; Dkt. 46-2 ¶ 1 (Statement of Uncontroverted Facts).) As part of the application, Plaintiff provided her telephone number as the best number at which to contact her. (Dkt. 46-2 ¶ 2.) The coverage agreement was effective as of April 1, 2014, and remained in effect until December 31, 2015. (Id. ¶ 3.) Coverage was set to renew automatically, though with modifications, for the 2016 year. (Id. ¶ 4.)

The Affordable Care Act and its regulations mandate that an individual's insurance coverage automatically renews to ensure continuity of coverage. (Dkt. 46-5 ¶ 4 (referencing 42 U.S.C. § 300gg–2 and 45 C.F.R. § 147.106).) However, insurance providers such as Blue Shield are authorized to modify insurance plans each year in various ways, including increasing premiums or copayment amounts, modifying

---

1. Blue Shield claims and Plaintiff does not contest that Plaintiff erroneously named Blue Shield of California Life & Health Insurance Company as defendant. (Dkt. 69 at 1 n.1.) For clarity, the Court uses the correct name above and abbreviates it as "Blue Shield" throughout this Order.

coverage for particular services, and delineating which medical providers were within the insurance network. (*See id.*) To ensure that individuals are aware of changes to their insurance, providers such as Blue Shield are required to provide written notice of renewal "before the date of the first day of the next annual open enrollment period" in which the individual can opt to select different coverage and/or a different insurance provider. *See* 45 C.F.R. § 147.106(f)(1); *see also id.* § 147.106(f)(2) (delineating notice requirements to individuals in plans that are not being modified); *id.* § 147.200 (describing the "summary of benefits and coverage" which must be included in notice given to individuals).

As authorized by the implementing regulations, the Centers for Medicare and Medicaid Services has issued guidance on the "form and manner of the notices that are required to be provided when a health insurance issuer ... renews a product." (Dkt. 46–8 Ex. L at 1.) The guidance states that insurers must include information about premiums, "significant changes to the enrollee's coverage," "other health coverage options," and "[c]ontact information for the consumer to call with questions." (*Id.* at 6; *see also id.* Attachment 7 (listing examples of significant changes as "changes in deductibles, cost sharing, ... covered benefits, eligibility and provider network").) The form letters provided in the guidance as examples of sufficient notice include phrases such as:

- **Important: [Name of issuer] is continuing to over your health coverage for next year. Some plan details may have changed. Unless you take action by [Date], you will be automatically enrolled to continue this coverage next year.... Read this letter to learn more and to review you options.**
- **This letter summarizes any changes to your coverage so you can decide if you want to keep your plan or look for a different one.**
- You can choose a new plan during Open Enrollment from [beginning date through end date].
- **So what are my options if ... I don't like the plan changes presented above?** YOU HAVE THREE WAYS TO LOOK INTO OTHER PLANS AND ENROLL: 1. Visit [Marketplace website] and look at other [Name of Marketplace] plans.
- Questions? Call [Name of issuer] at [Issuer phone number], or visit [Issuer website].

(*Id.* Attachment 1 (emphasis in original).)

Blue Shield, in compliance with applicable statutes and regulations, mailed Plaintiff a packet of information regarding changes to her insurance (*e.g.*, increasing premiums) in late 2015. (Dkt. 46–2 ¶ 5; Dkt. 46–5 ¶ 4; Dkt. 46 at 10.) Included in the packet was information of alternative insurance plans offered by Blue Shield. (Dkt. 46–5 ¶ 4.) In response to the numerous packets that were returned as undelivered in previous years, Blue Shield decided to call each of its existing members using a pre-recorded message to alert them to the fact that their packets had been mailed. (*Id.* ¶ 7.)

The text of the pre-recorded message went through several iterations and was drafted by Blue Shield's marketing communications department, which "houses the professional writers that are responsible for crafting all communications" with existing and prospective customers. (*Id.* ¶ 9.) The final script read:

Hello.

This is an important message from Blue Shield of California. It's time to review your 2016 health plan options and see what's new.

Earlier this month, we mailed you information about your 2016 plan and benefit changes. It compares your current health plan to other options from Blue Shield. You can also find out more online at blueshieldca.com. If you have not received your information packet in the mail, or if you have any questions, please call the number on the back of your member ID card.

Thank you.

Goodbye.

(Dkt. 46–2 ¶ 6.)

Blue Shield called Plaintiff at the number she provided on the Covered California application, which was her cellular telephone number, on December 3, 2015. (*Id.*) Three days later, she completed an application with Blue Shield for a different health insurance plan for the 2016 year. (*Id.* ¶ 7.)

## III. LEGAL STANDARD

The Court may grant summary judgment on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548. A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" when its resolution might affect the outcome of the suit under the governing law, and is determined by looking to the substantive law. *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 249, 106 S.Ct. 2505.

Where the movant will bear the burden of proof on an issue at trial, the movant "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). In contrast, where the nonmovant will have the burden of proof on an issue at trial, the moving party may discharge its burden of production by either (1) negating an essential element of the opposing party's claim or defense, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), or (2) showing that there is an absence of evidence to support the nonmoving party's case, *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548. Once this burden is met, the party resisting the motion must set forth, by affidavit, or as otherwise provided under Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. A party opposing summary judgment must support its assertion that a material fact is genuinely disputed by (i) citing to materials in the record, (ii) showing the moving party's materials are inadequate to establish an absence of genuine dispute, or (iii) showing that the moving party lacks admissible evidence to support its factual position. Fed. R. Civ. P. 56(c)(1)(A)–(B). The opposing party may also object to the material cited by the movant on the basis that it "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). But the opposing party must show more than the "mere existence of a scintilla of evidence"; rather, "there must be evidence on which the jury could reasonably find for

the [opposing party]." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party, and draw all justifiable inferences in its favor. *Id.*; *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The court does not make credibility determinations, nor does it weigh conflicting evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). But conclusory and speculative testimony in affidavits and moving papers is insufficient to raise triable issues of fact and defeat summary judgment. *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c). "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

## IV. DISCUSSION

The TCPA prohibits initiating "any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(B); *see also id.* § 227(A) (prohibiting making "any call (other than a call made … with prior express consent of the called party) … using any automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service").

## A. Standing

 As an initial matter, Blue Shield argues that Plaintiff has not suffered a concrete and particularized injury necessary for Article III standing. (Mot. at 24–25.) To establish Article III standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S.Ct. at 1547 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). With regard to the first element, "[t]o establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130).

The parties disagree on the scope of the Supreme Court's recent decision in *Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016)—particularly as it applies to TCPA cases. In *Spokeo*, the plaintiff brought a class action lawsuit against the operator of a "people search engine" for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et seq.*, upon discovering that the information the defendant had gathered and disseminated online about the plaintiff was incorrect. *Spokeo*, 136 S.Ct. at 1544. The FCRA "imposes a host of requirements concerning the creation and use of consumer reports," including the requirement that consumer reporting agencies "follow reasonable procedures to assure maximum possible accuracy of" consumer reports. *Id.* at 1545 (citing 15 U.S.C. § 1681e(b)). Both actual and statutory damages are available for FCRA violations. *Id.* (citing 15 U.S.C. § 1681n(a)). The Ninth Circuit had reversed the district court ruling that the plaintiff lacked stand-

ing and held that the plaintiff alleged adequate injury in fact, based on allegations that the defendant had violated *his* statutory rights, and that his personal interest in the handling of his credit information was sufficiently particularized. *Id.* at 1545.

The Supreme Court vacated the decision and remanded it to the Ninth Circuit because it had not considered *both* aspects of the injury in fact analysis: whether the injury was concrete *and* particularized. (*Id.*) The Supreme Court went on to explain that in some instances "Congress may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.' " *Id.* at 1549 (quoting *Lujan,* 504 U.S. at 578, 112 S.Ct. 2130). However, "Article III standing requires a *concrete* injury even in the context of a statutory violation. For that reason, [the plaintiff] could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.* (emphasis added). On the other hand, "the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact. In other words, a plaintiff in such a case need not allege any additional harm beyond the one Congress has identified." *Id.* Finally, the Court noted that "[a] violation of one of the FCRA's procedural requirements may result in no harm ... not all inaccuracies cause harm or present any material risk of harm. An example that comes readily to mind is an incorrect zip code. It is difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm." *Id.* at 1550.

■ Here, Blue Shield argues that Plaintiff lacks standing because she "has not alleged and cannot prove any concrete harm caused by Blue Shield.... She did not pay any additional money for the call." (Mot. at 25.) The Court disagrees that

Plaintiff's allegations are insufficient. In contrast with a FCRA violation, which "*may* result in no harm," *Spokeo,* 136 S.Ct. at 1550, a TCPA violation entails inherent harms sufficient to establish injury in fact. The TCPA codified a remedy for injuries that *already existed* in order to curb the problem of unwanted telemarketing calls. In determining that the TCPA encompasses text messages as well as telephone calls, the Ninth Circuit described the purpose of the TCPA as follows:

> The TCPA was enacted to "protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile machines and automatic dialers." S. Rep. No. 102–178, at 1 (1991), reprinted in 1991 U.S.C.C.A.N. 1968. The TCPA was enacted in response to an increasing number of consumer complaints arising from the increased number of telemarketing calls. *See id.* at 2. The consumers complained that such calls are a "nuisance and an invasion of privacy." *See id.* The purpose and history of the TCPA indicate that Congress was trying to prohibit the use of ATDSs to communicate with others by telephone in a manner that would be an invasion of privacy.

*Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946, 954 (9th Cir. 2009). Thus, "[u]nlike the statute at issue in *Spokeo ...* the TCPA section at issue does not require the adoption of procedures to decrease *congressionally-identified* risks.... It directly forbids activities that *by their nature* infringe the privacy-related interests that Congress sought to protect by enacting the TCPA.... In any event, section 227 establishes substantive, not procedural, rights to be free from telemarketing calls consumers have not consented to receive." *A.D. v. Credit One Bank, N.A.,* No. 14 C 10106,

2016 WL 4417077, at \*6–7 (N.D. Ill. Aug. 19, 2016) (emphasis added). For this reason, "other district courts have similarly distinguished statutory violations of the TCPA from statutory violations of the FCRA in the wake of the Court's *Spokeo* decision." *Cabiness v. Educ. Fin. Sols., LLC*, No. 16-CV-01109-JST, 2016 WL 5791411, at \*5 (N.D. Cal. Sept. 1, 2016) (citing *Mey v. Got Warranty, Inc.*, 193 F.Supp.3d 641, 644 (N.D. W. Va. 2016) (noting that the concern in *Spokeo* about a " 'bare procedural violation, divorced from any concrete harm' ... has little application to claims under the TCPA, since those claims are not based on 'bare procedural' rights, but rather on substantive prohibitions of actions directed toward specific consumers.")).

Unlike FCRA violations, TCPA violations necessarily cause harm to consumers. For example, *Cabiness* explained that "[e]very unconsented call through the use of an [Automatic Telephone Dialing System] to a consumer's cellular phone results in actual harm: the recipient wastes her time and incurs charges for the call if she answers the phone, and her cell phone's battery is depleted even if she does not answer the phone." *Cabiness*, 2016 WL 5791411, at \*5. "In addition to these tangible harms, unsolicited calls also cause intangible harm by annoying the consumer." *Id.* Although the *Cabiness* decision was limited because the plaintiff had alleged *additional* harms such as "stress and anxiety," *see id.*, the Court finds the *Cabiness* reasoning instructive here.

Blue Shield relies on two district court cases decided after *Spokeo* which assert that a TCPA violation on its own is not sufficient to constitute injury in fact. (Mot. at 24–25 (citing *Romero v. Dep't Stores Nat'l Bank*, 199 F.Supp.3d 1256 (S.D. Cal. 2016) and *Sartin v. EKF Diagnostics, Inc.*, No. CV 16-1816, 2016 WL 3598297 (E.D. La. July 5, 2016)).) In *Romero*, the plaintiff alleged that the defendant called her 290 times using an automated telephone dialing system over the course of six months. *Romero*, 199 F.Supp.3d at 1259. *Romero* found that the plaintiff had not met her burden of establishing standing under *Spokeo* because the fact "[t]hat Defendants called Plaintiff's cell phone may satisfy the 'particular' component, but it does not automatically satisfy the requirement that the injury be 'concrete.' " *Id.* at 1262. The *Romero* court reasoned that a TCPA violation did not necessarily confer standing because "it is possible that the recipient's phone was not turned on or did not ring, that the recipient did not hear the phone ring, or the recipient for whatever reason was unaware that the call occurred." *Id.* The other case on which Blue Shield relies decided that the plaintiffs lacked standing for similar reasons. *See Sartin v. EKF Diagnostics, Inc.*, No. CV 16-1816, 2016 WL 3598297, at \*3 (E.D. La. July 5, 2016) ("Although Dr. Sartin has plausibly alleged that defendants violated the TCPA by sending unsolicited fax advertisements, he fails to plead facts demonstrating how this statutory violation caused him concrete harm.").

In light of the specific purpose and history of the TCPA, the Court agrees with those federal courts that have criticized the *Romero* line of cases. *See, e.g., LaVigne v. First Cmty. Bancshares, Inc.*, No. 1:15-CV-00934-WJ-LF, 215 F.Supp.3d 1138, 2016 WL 6305992, at \*6 (D.N.M. Oct. 19, 2016) ("Defendants have also offered *Romero* [to support lack of TCPA standing], which is hardly convincing. Under its rather draconian analysis, a plaintiff would find it almost impossible to allege a harm as a result of these robocalls. Worse, the case ignores the existence of intangible harms that have been recognized in the legislative history and in the case law. The Court agrees with plaintiff that *Romero* is an outlier in holding that a violation of the TCPA is a bare procedural violation and

that some additional harm must be shown to establish standing."); *A.D.*, 2016 WL 4417077, at *7 ("The Court respectfully disagrees with the reasoning of the judge in *Sartin*. In contrast to statutes that impose obligations regarding how one manages data, keeps records, or verifies information, section 227 of the TCPA directly prohibits a person from taking actions directed at consumers who will be touched by that person's conduct. It does not matter whether a plaintiff lacks additional tangible harms like wasted time, actual annoyance, and financial losses. Congress has identified that unsolicited telephonic contact constitutes an intangible, concrete harm, and A.D. has alleged such concrete harms that she herself suffered. It would be redundant to require a plaintiff to allege that her privacy and solitude were breached by a defendant's violation of section 227, because Congress has provided legislatively that a violation of section 227 is an invasion of the call recipient's privacy.")

In this case, Plaintiff alleges a concrete and particularized injury by laying out the elements of a TCPA violation. Additionally, Plaintiff alleges that her privacy was invaded. (*See* Dkt. 68 at 24.) This is precisely the type of harm that the TCPA was enacted to prevent. *Satterfield*, 569 F.3d at 954; *see, e.g., Holderread v. Ford Motor Credit Co., LLC*, No. 4:16-cv-00222, 2016 WL 6248707, at *2 (E.D. Tex. Oct. 26, 2016) ("The harm caused by unwanted phone calls is closely related to an invasion of privacy, which is a widely recognized common law tort.... Congress identified the intangible harm of invasion of privacy as legally cognizable. Considering this history and Congress's judgment, the Court finds an invasion of privacy within the context of the TCPA constitutes a concrete harm that meets the injury-in-fact requirements."); *Griffith v. ContextMedia, Inc.*, No. 16-C-2900, 2016 WL 6092634, at *1–2 (N.D. Ill. Oct. 19, 2016) ("The complaint

also alleges that plaintiff 'lost time reading, tending to and responding to' the unsolicited communications, and that the texts *invaded her privacy*. Courts in this district have held, both before and after the Court's decision in *Spokeo*, ... that loss of time and privacy are concrete injuries for the purpose of conferring Article III standing.") (emphasis added); *Hewlett v. Consolidated World Travel, Inc.*, No. 16-713 WBS, 2016 WL 4466536, at *2 (E.D. Cal. Aug. 23, 2016) ("Courts have consistently held that allegations of nuisance and *invasion of privacy* in TCPA actions are sufficient to state a concrete injury under Article III.") (emphasis added); *Krakauer v. Dish Network L.L.C.*, 168 F.Supp.3d 843, 845 (M.D.N.C. 2016) (TPCA violations "are more than bare procedural violations; here, Satellite Systems Network, Dish's alleged agent, actually called the class members' numbers. These calls form concrete injuries because unwanted telemarketing calls are a disruptive and annoying *invasion of privacy* .... While class members did not necessarily pick up or hear ringing every call at issue in this case, each call created, at a minimum, a *risk of an invasion of a class member's privacy*. *Spokeo* clarified that a 'risk of real harm' was enough to show concrete injury.") (emphasis added); *Caudill v. Wells Fargo Home Mortgage, Inc.*, No. 16-cv-066, 2016 WL 3820195, at *2 (E.D. Ky. Jul. 11, 2016) ("These alleged harms, such as *invasion of privacy*, have traditionally been regarded as providing a basis for a lawsuit in the United States.... Further, when Congress established the TCPA in 1991, it did so to protect consumers from the 'nuisance, invasion of privacy, cost, and inconvenience that autodialed and prerecorded calls generate.' ... Based on *Spokeo*, the Court is satisfied that Caudill has alleged an injury-in-fact that is concrete and particularized.") (emphasis added). According-

ly, Plaintiff has standing to bring this action.

### B. Consent

■ The TCPA prohibits pre-recorded phone calls made without prior express consent of the called party. 47 U.S.C. § 227(a),(b)(1)(B). Accordingly, consent is a defense to a TCPA claim. *Grant v. Capital Mgmt. Servs., L.P.*, 449 Fed.Appx. 598, 600 n.1 (9th Cir. 2011).

The TCPA delegated to the FCC the authority to "prescribe regulations to implement [its] requirements." 47 U.S.C. § 227(b)(2). The FCC has issued rules and regulations regarding the issue of "prior express consent," stating that "persons who knowingly release their phone numbers have in effect given their invitations or permission to be called at the number which they have given, absent instructions to the contrary." *See* In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order, 7 FCC Rcd. 8752, 8769 (Oct. 16, 1992).

In relationships between consumers and businesses, providing one's phone number has generally been deemed to constitute implied consent to communications that are *closely related* to the purpose for which the number was provided. *See, e.g., Satterfield*, 569 F.3d at 954–55 (9th Cir. 2009) (holding that provision of a phone number to receive promotional material from Nextones or their affiliates and brands did not consent to messages from a different company to whom Nextones provided the phone number); *Roberts v. PayPal, Inc.*, No. C 12-622 PJH, 2013 WL 2384242, at *4 (N.D. Cal. May 30, 2013) (finding that the plaintiff had consented to receive text messages "closely related to the circumstances under which [he had] ... provided his cell phone number"); *Aderhold v. Car2go N.A., LLC*, No. C13-489RAJ, 2014 WL 794802, at *8 (W.D.

Wash. Feb. 27, 2014), *aff'd*, No. 14-35208, 668 Fed.Appx. 795, 2016 WL 4709873 (9th Cir. Sept. 9, 2016) ("Although the court has no need to consider how broadly to construe the consent of a consumer who provides his cellular phone number to an entity, this court concurs with others who have concluded that a consumer at least consents to text messages 'closely related to the circumstances under which plaintiff provided his cell phone number.'") (quoting *Roberts*); *Olney v. Job.com, Inc.*, No. 1:12-CV-01724-LJO, 2014 WL 1747674, at *7 (E.D. Cal. May 1, 2014) ("Defendant is correct that TCPA does not require that a call be made for the exact purpose for which the number was provided, but it undoubtedly requires that the call bear some relation to the product or service for which the number was provided.") (quotation omitted); *Hudson v. Sharp Healthcare*, No. 13-CV-1807-MMA NLS, 2014 WL 2892290, at *6 (S.D. Cal. June 25, 2014) ("The TCPA does not require that calls be made 'for the exact purpose for which the number was provided,' but rather that the call 'bear some relation to the product or service for which the number was provided.'") (quoting *Hudson*); *Taylor v. Universal Auto Grp. I, Inc.*, No. 3:13-CV-05245-KLS, 2014 WL 6654270, at *11 (W.D. Wash. Nov. 24, 2014) ("That is, because the 2009 'welcome' message is closely related to the circumstances under which plaintiff provided his cellular telephone number to old Tacoma Dodge, he gave his prior express consent to be called on that phone by defendant.").

On October 16, 2013, FCC regulations went into effect that carved out telemarketing calls to cellular telephones from the general paradigm wherein providing a phone number constituted implied consent to receive closely related calls. *See* 47 C.F.R. § 64.1200(a). Instead, the regulations prohibit "any telephone call that includes or introduces an advertisement or

constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice" to cellular telephones unless it is made "with the prior express *written* consent of the called party." *Id.* § 64.1200(a)(2) (emphasis added).

The regulations define "advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services." *Id.* § 64.1200(f)(1). "Telemarketing" is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." *Id.* § 64.1200(f)(12).

As for the term "prior express written consent," it "means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered." *Id.* § 64.1200(f)(8). In addition, that written consent agreement must "include a clear and conspicuous disclosure informing the person signing that ... [they] authorize[ ] the seller to deliver ... telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice." *Id.* § 64.1200(f)(9). Finally, even with express written consent, such calls must "provide an automated, interactive voice– and/or key press-activated opt-out mechanism for the called person to make a do-not-call request, including brief explanatory instructions on how to use such mechanism." *Id.* § 64.1200(b)(3).

▪ In this case, Blue Shield argues, and Plaintiff does not contest, that she provided express consent by providing her cellular telephone number as the best number to reach her on her Covered California application. (Mot. at 15; Dkt. 68 at 13.) However, Plaintiff argues that the call constituted *telemarketing* and accordingly express *written* consent was required. (Dkt. 68 at 13.) The parties do not dispute that providing her number as the best way to reach her does not constitute express written consent—there was no clear authorization of telemarketing, there was no disclosure informing her that she was providing such consent (let alone a clear and conspicuous disclosure), and the call's text did not include or reference an opt-out mechanism. (*See* Mot. at 15–16; Dkt. 68 at 13–14.) Therefore, this case turns on whether the call constituted telemarketing.

The Ninth Circuit has stated that courts should evaluate the content of purported telemarketing "with a measure of common sense." *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012). On the one hand, "explicit mention of a good, product, or service [is not necessary] where the implication is clear from the context" and additional, informative content does not inoculate telemarketing advertisements. *Id.* On the other, "messages 'whose purpose is to facilitate, complete, or confirm a commercial transaction that the recipient has previously agreed to enter into with the sender are not advertisements.'" *Aderhold v. car2go N.A. LLC*, No. 14-35208, 668 Fed.Appx. 795, 796, 2016 WL 4709873, at *1 (9th Cir. Sept. 9, 2016) (unpublished) (quoting *In re Rules & Regs. Implementing the Tel. Consum. Prot. Act of 1991*, 21 FCC Rcd. 3787, 3812 ¶ 49 (Apr. 6, 2006)).

Blue Shield argues that because the call was purely informational it was not an advertisement or telemarketing call. (Mot. at 16–19.) Plaintiff disagrees, based on the fact that the calls were (1) discussed as part of a retention strategy, (2) written by the marketing team, and (3) initially drafted to link to Blue Shield's renewal page

and included "We want to keep you covered." (Dkt. 68 at 16–17.)

Simply stated, the text of Blue Shield's telephone call is informational. It notified recipients that they should have received information about changes to their insurance plan, encouraged them to seek out information about their plan by examining the information packet and visiting Blue Shield's website, and directed them to call the member service number (as opposed to the sales department) to resolve any questions or issues. (Dkt. 46–5 ¶ 10.) This content is virtually identical to the CMS template letters insurers such as Blue Shield send to customers regarding renewal. Both messages emphasize the importance of their contents, highlight that customers' insurance plans and benefits had changed, inform recipients that there are alternative plans available, provide the insurer's contact information, and convey the time-sensitivity of the information and the opportunity to renew or modify one's insurance coverage. The only additional content in the calls versus the mailing *references the mailing*—informing recipients that (1) Blue Shield mailed them information and (2) what to do if they had not yet received their mailing—and is similarly informational. *Cf. Chesbro*, 705 F.3d at 918 ("Thus, the calls encouraged the listener to make future purchases at Best Buy.... Any additional information provided in the calls does not inoculate them.").

The informative, non-telemarketing nature of the call is consistent with those in other decisions delineating the informative nature of messages. *See, e.g., Daniel v. Five Stars Loyalty, Inc.*, No. 15-CV-03546-WHO, 2015 WL 7454260, at *3 (N.D. Cal. Nov. 24, 2015) (holding that a text message received within minutes of opting into a rewards program and stating "Welcome to Five Stars, the rewards program of Flame Broiler. Reply with your email to finish registering and get free pts! Txt STOP to unsubscribe." provided information about how to complete registration and did not constitute advertising or telemarketing); *Aderhold*, No. C13-489RAJ, 2014 WL 794802, at *9 (holding that text received within seconds of submitting an online registration form to car2go and stating "Please enter your car2go activation code 145858 into the emailed link. We look forward to welcoming you to car2go." was informative, not telemarketing); *Wick v. Twilio Inc.*, No. C16-00914RSL, 2016 WL 6460316, at *1, *2–3 (W.D. Wash. Nov. 1, 2016) (holding that text message stating "Noah, Your order at Crevalor is incomplete and about to expire. Complete your order by visiting http//hlth.co/xDoXEZ." did not constitute telemarketing).

The content of the call also contrasts starkly with messages that courts have deemed to be telemarketing or advertising. Unlike the call in question here, those messages unequivocally evoke or reference commerce. *See, e.g., Larson v. Harman Mgmt. Corp.*, No. 116CV00219DADSKO, 2016 WL 6298528, at *1, *3–4 (E.D. Cal. Oct. 27, 2016) ("Float into A & W for a 99 cent Reg. Sized Root Beer Float! Limit 1."); *Drew v. Lexington Consumer Advocacy, LLC*, No. 16-CV-00200-LB, 2016 WL 1559717, at *1, *6 (N.D. Cal. Apr. 18, 2016) ("Struggling to get ahead but your cash advances holding you back? We can make them go away ... call 4753291921 for info."); *Chesbro*, 705 F.3d at 918 (calls urging recipient to "redeem" Reward Zone points); *Consumer Prot. Corp. v. Neo-Tech News*, No. CV 08-1983-PHX-JAT, 2009 WL 2132694, at *1 (D. Ariz. July 16, 2009) (fax listing the share price of JYTO [a stock] and stating that "JYTO IS ALREADY A WINNER!" and is a "Strong Buy"); *Meyer v. Bebe Stores, Inc.*, No. 14-CV-00267-YGR, 2015 WL 431148, at *3 (N.D. Cal. Feb. 2, 2015) (message offering "10% OFF reg-price in-store/online").

Furthermore, deeming the content of the call to be informative rather than constituting advertising or telemarketing is consistent with the Health Insurance Portability and Accountability Act ("HIPPA"). This case does not arise under that statutory scheme or its implementing regulations, but given that it regulates communications between insurers and customers, consistency with HIPPA is relevant to this Court's determinations.

HIPPA regulations allow insurers to contact their members about matters relating to renewal or replacement of their insurance coverage. *See* 45 C.F.R. § 164.502(a)(1)(ii) (authorizing the use of protected health information by insurers for its health care operations); *id.* § 164.501 (defining health care operations to include "the creation, renewal, or replacement of a contract of health insurance or health benefits"). However, HIPPA requires an individual's written authorization before making marketing communications. *Id.* § 164.508(a)(3). Marketing is defined as "a communication about a product or service that encourages recipients of the communication to purchase or use the product or service" but explicitly excludes "communications about[ ] the entities participating in a health care provider network or health plan network [and] replacement of, or enhancements to, a health plan." *Id.* § 164.501. The call in this case is, therefore, not marketing under HIPPA as it is entirely about changes to and replacement of Plaintiff's health insurance.

Plaintiff's only argument based on the actual text of the call is that urging recipients to visit Blue Shield's website transformed the call into telemarketing. (Dkt. 68 at 17.) Blue Shield's internal discussions regarding inclusion of the website in the call's script demonstrate that the goal was to direct customers to Blue Shield's member renewal tool, which allowed consumers to compare their current plan with various Blue Shield alternatives. (*See* Dkt. 61 Ex. 14.) However, the renewal tool was purely informational—if customers "wanted to switch plans or purchase a plan [they] would have to access a different portion of the website." (Dkt. 69 at 7 n.4.) The mere fact that parts of Blue Shield's website contains the capability of allowing consumers to engage in commerce does not transform any message including its homepage into telemarketing or advertising. *See Aderhold*, No. C13-489RAJ, 2014 WL 794802, at *9 ("Attempting to connect the car2go text [Plaintiff] received to the sort of telemarketing call that is at the heart of the TCPA, he argues that because the text directed him to place an activation code into an email that ultimately connected to the car2go website which contains promotions for the car2go service, it was a telemarketing text.... It is manifestly insufficient that Mr. Aderhold could, after choices of his own making, divert himself from the registration process to car2go marketing.").

Plaintiff argues that various contextual facts make the call telemarketing or advertising. First, she argues that even if the text is facially informative, Blue Shield's overarching incentive to retain customers and receive premium payments creates a clear implication of encouraging purchase of a good, product, or service. (*See* Dkt. 68 at 17; *cf. Chesbro*, 705 F.3d at 918 ("Neither the statute nor the regulations require an explicit mention of a good, product, or service where the implication is clear from the context.").) However, that purpose is simply too attenuated to give rise to a *clear*, unequivocal implication of advertising. *See Daniel*, No. 15-CV-03546-WHO, 2015 WL 7454260, at *4 ("To the extent that it could be reasonably inferred based on context or otherwise that the text's purpose was also to "encourage future purchases at Flame Broiler," that purpose is simply too attenuated to make

the text telemarketing.... Certainly, the text was designed to allow Daniel to complete the registration process, which could result in an increase in the chances of Daniel making future purchases at Flame Broiler or other participants in the Five Stars program. But Daniel cites no authority indicating that this degree of connection between communication and purchase is sufficient to transform a text of the sort he received into a telemarketing message."). Were this Court to hold otherwise, it would transform practically *all* communication from any entity that is financially motivated and exchanges goods or services for money into telemarketing or advertising, which would contravene the delineated definitions of telemarketing and advertising in 47 C.F.R. § 64.1200(f)(1),(12).

Plaintiff also attempts to construe the call as telemarketing and advertisement based on its earlier drafts and its context. (Dkt. 68 at 3–10.) However, the *deletion* of a phrase expressing Blue Shield's desire to keep its customers insured does little to change the informational valence of the call, first and foremost because it was not actually part of the call and also because it is clearly a friendly salutation that at most barely and obliquely encourages commercial activity. Similarly, the fact that Blue Shield initially conceptualized the call as a component of its overall customer retention efforts is insignificant. (*See, e.g.,* Dkt. 63 Ex. 8 at 107.) The call was devoid of marketing content and Blue Shield's discussions around the call centered on *ameliorating* its members' failure to open the mandated mailing and their subsequent displeasure at insurance coverage changes. (*See, e.g.,* Dkt. 46–5 Ex. D.) If the Court accepted Plaintiff's argument, nearly all innocuous, customer-friendly and informative gestures would be needlessly transformed into telemarketing and advertising.

Evaluating Blue Shield's call with a measure of common sense, the Court must conclude that the call is not telemarketing or advertisement within the meaning of 47 C.F.R. § 64.1200(f)(1),(12).[2] It makes no sense to the Court that a single call tracking Blue Shield's mandatory communications regarding insurance enrollment and renewal would expose Blue Shield to millions of dollars of liability under the TCPA.

## V. CONCLUSION

For the foregoing reasons, Blue Shield's motion for summary judgment is GRANTED.

---

**2.** Because the Court finds that the call does not constitute telemarking or advertisement, the Court need not address Blue Shield's other arguments for summary judgment.