Filed 5/5/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ROBERT TOOTHMAN, | |
| Plaintiff and Respondent, | A171567 |
| v. | |
| REDWOOD TOXICOLOGY LABORATORY, INC., | (Sonoma County Super. Ct. No. SCV-271680) |
| Defendant and Appellant. | |

Redwood Toxicology Laboratory, Inc. appeals from an order denying its motion to compel Robert Toothman to arbitrate his individual employment claims against it and to dismiss his class claims. Redwood claimed that Toothman was bound by an arbitration agreement (Arbitration Agreement) he had signed with Apex Life Sciences, LLC, a temporary employment agency that initially placed him with Redwood. After Toothman's employment with Apex ended, Redwood hired him directly. Toothman's claims against Redwood are based exclusively on this period of direct employment.

We conclude that the trial court correctly denied Redwood's motion for the following reasons: Redwood was not a party to the Arbitration Agreement; even if it could be considered a third-party beneficiary, the Arbitration Agreement did not cover claims arising from Toothman's employment with Redwood; and Toothman was not equitably estopped from refusing to arbitrate because his claims were not intertwined with or founded in the Arbitration Agreement. We therefore affirm the order.

# BACKGROUND

Apex is an employment agency that hires and places temporary workers at other businesses. In January 2018, Apex hired Toothman for that purpose. Toothman and Apex entered into an employment agreement (Employment Agreement) and the companion Arbitration Agreement under which they agreed to arbitrate employment disputes.

The Arbitration Agreement stated that it was between "Employee," i.e., Toothman, and "Company," which the agreement defined as "Apex Life Sciences, LLC, a division of On Assignment, Inc., its affiliates, subsidiaries and parent companies. . . ." Under its terms, Toothman and "Company" agreed "to arbitrate any dispute arising out of or related to [Toothman's] employment with, or termination of employment from, Company." They also waived the right to bring class or representative claims.

Apex placed Toothman at Redwood, where Toothman worked exclusively until his employment with Apex ended in April 2018. Toothman then began working directly for Redwood, where he stayed until June 2022. Toothman and Redwood did not enter into an arbitration agreement, and the documents that Toothman signed upon hire did not refer to the Arbitration Agreement.

On September 26, 2022, about three months after leaving his job with Redwood, Toothman filed a class action against Redwood. The complaint alleged that he had been a Redwood employee from January 2018 to June 2022, and it alleged Labor Code violations with a maximum statutory period of limitation of four years. He thus based his claims on Redwood's alleged conduct starting no earlier than September 26, 2018, well after he had stopped working for Apex and had started working directly for Redwood. The complaint defined the class as "all individuals who are or previously were

2

employed by [Redwood] in California, including any employees staffed with [Redwood] by a third party, and classified as non-exempt employees . . . at any time during the period beginning four (4) years prior to the filing of this [c]omplaint . . . ."

After Apex produced the Arbitration Agreement in response to a subpoena from Redwood, Toothman filed a first amended complaint (Complaint). The Complaint redefined the class to exclude "any workers staffed with [Redwood] by a third party while those workers were on assignment with [Redwood]." It expressly did not exclude "individuals, such as [Toothman], who were both direct employees and non-direct/staffed workers of [Redwood] at different periods of time," but it did exclude "any such time such individuals were not direct employees of [Redwood]."

Redwood filed a motion to compel arbitration, arguing that it was a party to the Arbitration Agreement because it qualified as an "affiliate" of Apex. It argued alternatively that it could enforce the Arbitration Agreement as a third-party beneficiary and that Toothman was equitably estopped from refusing to arbitrate. In addition to requesting an order to compel arbitration, Redwood sought dismissal of Toothman's proposed class claims. The trial court denied the motion.

## DISCUSSION

As an overarching theme, Redwood contends that the trial court erred by failing to analyze the Arbitration Agreement " 'with a healthy regard for the federal policy favoring arbitration' " (quoting *Arthur Andersen LLP v. Carlisle* (2009) 556 U.S. 624, 630, fn. 5) and failing to apply Federal Arbitration Act (FAA) (9 U.S.C. §1 et seq.) presumptions in favor of arbitration. In Redwood's view, the trial court should have resolved any ambiguity in favor of granting Redwood's motion.

3

The FAA's " 'policy favoring arbitration,' " the United States Supreme Court has explained, " 'is merely an acknowledgment of the FAA's commitment to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts.' " (*Morgan v. Sundance, Inc.* (2022) 596 U.S. 411, 418.) Accordingly, it is both federal policy and California policy to treat arbitration agreements like other agreements. (*Id.* at pp. 418–419; *Fuentes v. Empire Nissan, Inc.* (2026) 9 Cal.5th 93, 110, citing *Quach v. California Commerce Club, Inc.* (2024) 16 Cal.5th 562, 579; *Ford Motor Warranty Cases* (2025) 17 Cal.5th 1122, 1128.) Whether under this standard courts must nonetheless resolve any ambiguities in favor of arbitration, as Redwood contends, is a question we find immaterial here. For the reasons discussed below, the Arbitration Agreement is not reasonably susceptible to an interpretation in which it covered the claims Toothman alleges in his Complaint, so applying a presumption in favor of arbitrability would not change the result.

As a fundamental matter, " ' "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." ' " (*Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 (*Pinnacle*), quoting *AT&T Technologies v. Communications Workers* (1986) 475 U.S. 643, 648.) Thus, before a trial court may grant a motion to compel arbitration, it must determine that the opposing party agreed to arbitrate the dispute. (See Code Civ. Proc., § 1281.2; *Gamboa v. Northeast Community Clinic* (2021) 72 Cal.App.5th 158, 164 (*Gamboa*).) " 'General principles of California contract law guide the court in making this determination.' " (*Ford Motor Warranty Cases, supra,* 17 Cal.5th at p. 1128.)

4

When "a party to an arbitration agreement alleg[es] the existence of a written agreement to arbitrate a controversy," the party may move for an order to arbitrate based on the agreement. (Code Civ. Proc., § 1281.2.) The moving party bears the burden of proving that such an agreement exists. (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 413 (*Rosenthal*).) As part of its burden, the moving party must first produce prima facie evidence of the agreement. (*Gamboa, supra*, 72 Cal.App.5th at pp. 164–165, citing *Rosenthal*, at p. 413.) If the opposing party contests the authenticity, validity, or general enforceability of the agreement, the burden then shifts to that party to produce evidence in support of such a defense. (*Rosenthal*, at p. 413.)

"Because arbitration is a matter of contract, generally ' "one must be a party to an arbitration agreement to be bound by it or invoke it." ' " (*DMS Services, LLC v. Superior Court* (2012) 205 Cal.App.4th 1346, 1352–1353.) If only the opposing party entered the agreement, however, the moving party may still seek to compel arbitration under alternative theories. (*Soltero v. Precise Distribution, Inc.* (2024) 102 Cal.App.5th 887, 892–893, 898.) One is that the moving party is a third-party beneficiary of the agreement. (*Ibid.*) Another is that the opposing party is equitably estopped from contesting arbitration. (*Id.* at pp. 892–893.)

We review de novo a trial court's denial of a motion to compel arbitration where, as here, there is no dispute about the material facts. (*Pinnacle, supra*, 55 Cal.4th at p. 236.)

## I.

Redwood first contends that the trial court erred by failing to apply the above-described burden-shifting protocol. Redwood argues that it carried its initial burden by submitting the Arbitration Agreement, thus shifting the

5

burden to Toothman to submit evidence showing that it was not enforceable. Redwood contends that Toothman failed to do so, and thus the protocol compelled the court to order arbitration. We are not persuaded.

The decisions cited by Redwood show that courts shift the burden when the opposing party contests the existence, validity, or general enforceability of an arbitration agreement—for example, because of fraud in the execution, a signature's inauthenticity, or unconscionability. (See *Rosenthal, supra*, 14 Cal.4th at p. 413 [fraud in the execution]; *Iyere v. Wise Auto Group* (2023) 87 Cal.App.5th 747, 754–755 [signature authenticity and unconscionability]; *Bannister v. Marindence Opco, LLC* (2021) 64 Cal.App.5th 541, 543–545 [signature authenticity]; *Gamboa, supra*, 72 Cal.App.5th at p. 168 [agreement authenticity]; *Hotels Nevada v. L.A. Pacific Center, Inc.* (2006) 144 Cal.App.4th 754, 759, 760, 761–765 [fraud in the execution]; *Owens v. Intertec Design, Inc.* (1995) 38 Cal.App.4th 72, 73–75 [coercion and other grounds for revocation].) Redwood cites no burden-shifting decision in which the party opposing arbitration challenged the applicability of the agreement because the party invoking the agreement was not a signatory. Indeed, the text of Code of Civil Procedure section 1281.2 presupposes that the moving party and the opposing party are parties to the alleged arbitration agreement: "On petition of *a party to an arbitration agreement* alleging the existence of a written agreement to arbitrate a controversy and that *a party to the agreement* refuses to arbitrate that controversy, the court shall order the petitioner and the respondent to arbitrate the controversy . . . ." (Italics added.)

*Jones v. Jacobson* (2011) 195 Cal.App.4th 1 is directly on point. There, the moving parties argued that they had carried their initial burden by submitting an arbitration agreement that they had not signed. (*Id.* at p. 15.)

6

The court disagreed, concluding that "in such instances, the nonsignatory bears the burden to establish he or she is a *party* to the arbitration agreement/provision covering the dispute." (*Ibid.*; cf. *Kinder v. Capistrano Beach Care Center, LLC* (2023) 91 Cal.App.5th 804, 808, 812–816 [moving party "did not meet its initial burden to make a prima facie showing that [the opposing party] agreed to arbitrate by submitting arbitration agreements signed by [the opposing party's] adult children" purportedly on her behalf].) We reach the same conclusion. Toothman does not contest the Arbitration Agreement's general enforceability in the sense contemplated by the decisions Redwood cites. He argues instead that *Redwood* may not enforce the Arbitration Agreement because Redwood is not a party to it. It would make little sense to deem Redwood's submission "prima facie evidence of a written agreement to arbitrate the controversy" (*Rosenthal, supra*, 14 Cal.4th at p. 413) when Redwood does not appear as a signatory on the face of the document. Instead, Redwood must establish that it is a party to the Arbitration Agreement as part of its initial burden.

This understanding of the protocol is consistent with the lines of decisions addressing the third-party beneficiary and equitable-estoppel theories. Those decisions make no mention of a burden shift even though a nonsignatory moving party has produced an arbitration agreement. (See, e.g., *Soltero v. Precise Distribution, Inc., supra*, 102 Cal.App.5th at p. 899 [nonsignatory moving party "failed to demonstrate that it is an intended third party beneficiary"]; *Ford Motor Warranty Cases, supra*, 17 Cal.5th at pp. 1126, 1128–1138 [resolving equitable estoppel argument without shifting burden to opposing party].) Thus, whether Redwood claims an entitlement to compel arbitration as a party to the Arbitration Agreement or under one of its alternative theories, it is Redwood's burden to establish the prerequisite

7

for that entitlement—i.e., that it was a party or beneficiary, or that there were facts warranting equitable estoppel.

## II.

Redwood contends that, although it is not a signatory, it is either a "direct party" or an "express beneficiary" entitled to enforce the Arbitration Agreement because it was Apex's "affiliate." We disagree.

The Arbitration Agreement provides that it is between "Employee," on the one hand, and "Apex Life Sciences, LLC, a division of On Assignment, Inc., its affiliates, subsidiaries and parent companies ('Company')" on the other. There is no dispute that Toothman signed as "Employee," that an Apex representative signed for "Company," and that Redwood was not included on the signature page. The Arbitration Agreement does not define "affiliates."

When Toothman and Apex signed the Arbitration Agreement, they also entered into the Employment Agreement, which refers to the Arbitration Agreement as "Exhibit 1." The Employment Agreement explains that Apex is "engaged in the business of hiring contract employees to perform services on a temporary basis to third party businesses," which the Employment Agreement then defines as "Clients." Redwood does not dispute that it was such a Client. Nor does Redwood contend that it shared ownership or means of control with Apex.

Under California law, we interpret a contract to give effect to the mutual intention of the parties at the time they made the agreement. (Civil Code, § 1636.) Companion contracts "relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." (*Id.*, § 1642.) A disputed contract term is to be understood in its "ordinary and popular sense," unless used by

8

the parties in a technical sense. (*Id.*, § 1644.) A guiding principle is that a term takes meaning from the company it keeps, meaning in part that "a court will adopt a restrictive meaning of a listed term if acceptance of a more expansive meaning would . . . make the item markedly dissimilar to the other items in the list." (*Almond Alliance of California v. Fish & Game Com.* (2022) 79 Cal.App.5th 337, 364). Another guiding principle is that "courts must avoid interpretations that would render terms of an instrument mere surplusage." (*Pear v. City and County of San Francisco* (2021) 67 Cal.App.5th 61, 70.) We may look to contemporaneous dictionary definitions to ascertain the meaning of a term. (See *Mendoza v. Nordstrom, Inc.* (2017) 2 Cal.5th 1074, 1091.)

Applying these principles, we agree with the trial court that the parties did not intend to include "Clients" like Redwood in the Arbitration Agreement's definition of "Company." Were it otherwise, the parties could have added the term "Clients"—defined in the companion Employment Agreement—to the Arbitration Agreement's definition of "Company," which already included "affiliates, subsidiaries and parent companies." Alternatively, the parties could have used the term "affiliates" in place of the term "Clients" in the Employment Agreement to describe entities like Redwood. The parties did neither.

In addition, shoehorning "Clients" into the term "affiliates," as Redwood proposes, would render "affiliates" markedly different from the other terms in the list comprising "Company"—namely "Apex Life Sciences, LLC, a division of On Assignment, Inc." and its "subsidiaries and parent companies." Those terms are alike in that they involve common control or ownership, as makes sense under the umbrella term "Company." "Clients,"

9

by contrast, were businesses connected to Apex through arms-length contractual relationships.

Nonetheless, Redwood proposes that "affiliates" should be understood by reference to a dictionary definition as " '[c]ompanies that have a [sic] shared resources, interests, or business dealings,' " which it contends is broad enough to cover "Clients" like itself. Aside from the considerations discussed above that make such an interpretation unlikely, Redwood's representation of the proposed definition has two flaws. The first is that Redwood, citing its own trial court papers, claims the definition comes from Black's Law Dictionary (Black's), but those papers attribute it to an undated entry in The Law Dictionary, an online resource "featuring Black's Law Dictionary, 2nd Ed." (<https://thelawdictionary.org/affiliate> (as of March 11, 2026).) The second edition of Black's—published in 1910—does not define "affiliate" or any related term. (See Black's Law Dict. (2nd ed. 1910) p. 47, col. 1.) The second, more significant, flaw is that Redwood does not provide The Law Dictionary's full entry, which ends by instructing the reader to "[r]efer to su[b]sidiary." (https://thelawdictionary.org/affiliate (as of March 11, 2026).) The Law Dictionary defines "subsidiary" as an "[e]nterprise that is controlled by another by owning more than 50 % of voting stock," adding, "See affiliate." (<https://thelawdictionary.org/subsidiary> (as of March 11, 2026).) These cross-references suggest relationships of ownership and control, consistent with the language and the context of the Arbitration Agreement.

Other dictionary definitions also include the notion of shared ownership or control. Toothman offers the following definition for an "[a]ffiliate company" from Black's sixth edition: "Company effectively controlled by another company. A branch, division, or subsidiary." (Black's Law Dict. (6th ed. 1990) at p. 58, col. 2.) Black's tenth edition, in circulation

10

at the time the Arbitration Agreement was signed, defines "affiliate" as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." (Black's Law Dict. (10th ed. 2014) at p. 69, col. 2.)

Redwood argues that a similar definition adopted by the trial court impermissibly rendered "affiliates" surplusage because "subsidiaries" and "parent companies" are already part of the "Company" definition. We disagree. The two Black's definitions are broader than just "subsidiaries" and "parent companies"—they include sibling companies, branches, divisions, and potentially other unlisted corporate-entity designations. (See Black's Law Dict. (6th ed. 1990) at p. 58, col. 2.; Black's Law Dict. (10th ed. 2014) at p. 69, col. 2.) "Affiliates" understood in light of these definitions—and the language and context of the two agreements—is a useful catch-all, not a redundancy.

The broader definitions Redwood offers outside the context of corporate entities are not persuasive because the Arbitration Agreement uses the term "affiliates" in a provision listing corporate entities.

Both parties cite decisions in which courts construe "affiliate" or a similar term. (See, e.g., *Grande v. Eisenhower Medical Center* (2020) 44 Cal.App.5th 1147, 1164–1166; *Iqbal v. Ziadeh* (2017) 10 Cal.App.5th 1, 9–12; *Satterfield v. Simon & Shuster, Inc.* (9th Cir. 2009) 569 F.3d 946, 955; *Flintkote Co. v. General Acc. Assur. Co.* (N.D. Cal. 2006) 410 F.Supp.2d 875, 889; *Everington v. Riesen* (M.D. Fla. Aug. 15, 2024, No. 8:23-CV-2386-JLB-NHA), 2024 U.S. Dist. Lexis 145331 at pp. *10–*13; *Geier v. Mozido*, LLC (Del. Ch. Sept. 29, 2016, No. CV 10931-VCS), 2016 Del. Ch. Lexis 149 at pp. *15–*18.) The decisions have limited relevance, however, because we must give effect to the intentions of the parties in this case based on the agreement at hand.

11

Redwood argues that provisions in the Employment Agreement show an intent to benefit Clients, and thus, Redwood argues, "affiliates" must include "Clients." It points out, for example, that the Employment Agreement provided for Client approval of hours, confidentiality obligations relating to Client information and assignment of work product to the Client. But these provisions do not make clear why the parties would choose to use "Clients" in one place and "affiliates" in another if the parties meant them to refer to the same entities. Nor do the provisions make clear why the parties did not simply add "Clients" to the definition of "Company" if they meant it to include "Clients."

In addition, all of these provisions apply to *Apex* employees who are on "temporary assignment" with a Client. The question here, by contrast, is whether the Arbitration Agreement was intended to cover claims arising when Toothman was *not* employed by Apex and had been hired directly by Redwood, i.e., claims arising from or related to employment that is not subject to the Employment Agreement of which the Arbitration Agreement is a part. Construing the agreements together, we find no such intent. For example, the Employment Agreement explains the purpose of the Arbitration Agreement as follows: "Agency [i.e., Apex] has a principal place of business in Richmond, Virginia, but hires contract employees to work in numerous geographic areas. To facilitate uniformity in the application of this Agreement to the employees of Agency, Contract Employees are asked to review and execute the Dispute Resolution Agreement that is attached as **Exhibit 1** to this Agreement." Because a person hired directly by a Client is not employed pursuant to the Employment Agreement, and the Arbitration Agreement would not serve its stated purpose in that context, it is

12

unreasonable to interpret the Arbitration Agreement as applying to such a person.

We also note that the final numbered paragraph of the Arbitration Agreement states: "**AT WILL EMPLOYMENT**. This Agreement does not in any way alter the at-will status of my assignment/employment." The only plausible reading of this provision is that it refers to the at-will status of the employee with Apex (which is emphasized by bolded text in the Employment Agreement) whom Apex has placed on an at-will assignment with a Client. Apex would have no basis to make representations about the employment status of a person hired directly by a Client, nor to refer to that person's "assignment." For this reason, too, we find no intent to apply the Arbitration Agreement to disputes arising between a Client and its own employees.

As Redwood itself emphasizes, it learned of the existence of the Arbitration Agreement when Apex produced it in response to a subpoena. Contrary to Redwood's assertion that its interpretation makes "practical sense," it is not sensible to posit that Apex arrogated to itself the right to prescribe the dispute resolution procedure that governs employment disputes between one of its Clients and that Client's *own* employees—people who do not have an employment relationship with Apex—let alone to do so without notice to the Client. Moreover, the Arbitration Agreement bears the "Signature of Authorized Company Representative," yet Redwood's concession that it was not a signatory means the Apex representative who signed was not authorized to act on Redwood's behalf.[1] The evident absence

---

[1] At oral argument, Redwood confirmed its view that it was bound by the Arbitration Agreement as a party to it. That was perhaps a necessary concession for the narrow purpose of Redwood's argument. But imagine a hypothetical scenario in which Redwood preferred to resolve employment disputes in court, while one of its employees, previously employed by Apex,

13

of any intent to apply the Arbitration Agreement to disputes between a Client and its own employees further undermines the contention that "Company," by the inclusion of the word "affiliates," was intended to refer to Redwood.

## III.

Redwood argues that if it was not an "affiliate[ ]," it was still entitled to invoke the Arbitration Agreement as a third-party beneficiary. In support, Redwood points to the provisions in the Employment Agreement discussed above suggesting that it was "structured to protect the client workplace." But because Redwood was not an "affiliate[ ]," the conduct alleged in the Complaint occurred after Toothman stopped working for "Company" and is thus not within the scope of the agreement regardless of whether Redwood could qualify as a third-party beneficiary. (Cf. *Vazquez v. SaniSure, Inc.* (2024) 101 Cal.App.5th 139, 142–147 [arbitration agreement from employee's first period of employment did not cover controversy arising in employee's second period of employment with same employer].)

Again, under the Arbitration Agreement, Toothman and "Company" agreed "to arbitrate any dispute arising out of or related to [Toothman's] employment with, or termination of employment from, Company." On

---

preferred arbitration. In an employment dispute with Redwood, the employee serves an arbitration demand on the Apex officer designated in the Arbitration Agreement, as the Agreement requires. Apex, seeing that the demand concerns a dispute arising after the person's employment with Apex ended, forwards it to Redwood along with a copy of the Arbitration Agreement. Redwood has never seen it before, is nowhere mentioned in it, and did not authorize anyone at Apex to enter into such an agreement on its behalf. The employee insists that the inclusion of the word "affiliates" means that Redwood is nonetheless bound to arbitrate the dispute as a party to the agreement. We would find the employee's argument unpersuasive, and we do not find it more persuasive here simply because Redwood is the party making it.

14

April 23, 2018, Toothman stopped working for "Company," and two days later he started working directly for Redwood. The Complaint alleges employment violations by Redwood beginning on September 26, 2018, more than five months after Toothman left his employment with "Company."

The claims in the Complaint thus "aris[e] out of or relat[e] to" Toothman's employment only with Redwood—not his employment with "Company." Toothman did not agree to arbitrate these claims with any party, because they are outside the Arbitration Agreement's substantive scope. We therefore need not decide whether Redwood was a third-party beneficiary.[2] Even if it were, the Arbitration Agreement would not apply to the claims in the Complaint.

For the same reason, we need not further address Redwood's contention that the Arbitration Agreement "did not terminate at the end of Toothman's employment with Apex," which rests principally on its argument that the term "affiliates" includes third-party businesses like Redwood that contracted with Apex at arm's length. Given our rejection of that argument above, we conclude that the Arbitration Agreement would continue in effect only for the purpose of resolving disputes arising out of or related to Toothman's employment with "Company"—not the claims in Toothman's Complaint.

---

[2] To show that Redwood was an express or third-party beneficiary of the Arbitration Agreement, Redwood asks us to take judicial notice of evidence that (1) it was a subsidiary of the company named in the Employment Agreement as the "Client" at which Toothman would be placed and (2) Toothman knew that the placement was with Redwood. But taken as true, these propositions do not affect our analysis or conclusion that Redwood was not an "affiliate[ ]" under the Arbitration Agreement. They thus do not affect our conclusion the Complaint's claims do not arise out of or relate to Toothman's employment with "Company," regardless of whether Toothman was an express or third-party beneficiary. We therefore deny Redwood's request. (See *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 544, fn. 4.)

15

## IV.

Redwood lastly argues that Toothman is equitably estopped from refusing to arbitrate his claims. Again we disagree.

Under the doctrine of equitable estoppel, a plaintiff may not repudiate the arbitration provision of an agreement that the plaintiff relies on to assert claims against a nonsignatory defendant. (*Gonzalez v. Nowhere Beverly Hills LLC* (2024) 107 Cal.App.5th 111, 118 (*Gonzalez*).) The doctrine requires that the plaintiff's claims be "dependent upon, or founded in and inextricably intertwined with, the underlying contractual obligations of the agreement containing the arbitration clause." (*Goldman v. KPMG, LLP* (2009) 173 Cal.App.4th 209, 217–218.)

Here, Toothman's claims are in no way "dependent upon," "founded in," or "inextricably intertwined with" the Arbitration Agreement or the Employment Agreement. Redwood contends that Toothman originally "pled his claims to include the Apex employment period." But while both complaints allege that Toothman began working for Redwood in January 2018—when Toothman was employed by Apex—the alleged misconduct in both complaints started no earlier than September 2018, when Toothman was directly employed by Redwood.[3] If the claims depend upon any agreement, it is Toothman's employment agreement with Redwood.

---

[3] At oral argument, Redwood suggested that under an emergency tolling rule in effect during the COVID pandemic, Toothman could assert claims extending as far back as April 2018, when he was still employed by Apex. (See Cal. Rules of Court, Appendix I, adopted by the Judicial Council on April 6, 2020, and amended on May 29, 2020 (Emergency Rule 9).) This argument is forfeited because Redwood did not raise it in its appellate briefs. (*County of Sonoma v. Superior Court* (2010) 190 Cal.App.4th 1312, 1326, fn. 10.) We would find the argument meritless in any event. Again, even Toothman's *original* pleading specified that the claims cover a period starting four years before Toothman filed in September 2022. Thus, assuming

16

The decisions Redwood cites are distinguishable because none involves a nonsignatory submitting an arbitration agreement that does not purport to cover the subject matter of the underlying dispute, as is the case here. (See *Gonzalez, supra*, 107 Cal.App.5th at pp. 115–119, 122–23 [addressing equitable estoppel in context of claims arising from subject matter covered by arbitration agreement]; *Garcia v. Pexco, LLC* (2017) 11 Cal.App.5th 782, 784–785, 787–788 [same]; *Boucher v. Alliance Title Co., Inc.* (2005) 127 Cal.App.4th 262, 265–266, 272–273 [same].)

Moreover, we do not agree that Toothman's amendment to the class definitions estops Toothman from contesting arbitration under the Arbitration Agreement. After Apex produced the Arbitration Agreement in response to Redwood's subpoena, Toothman amended the class definitions to

Emergency Rule 9 operates as Redwood suggests—an issue on which we do not opine—it would not support Redwood's contention in support of equitable estoppel that Toothman "artfully" amended the complaint to avoid the time Apex employed him. More importantly, any decision by Toothman not to assert claims for an additional period available to him by the operation of Emergency Rule 9 would not constitute "misleading artful pleading" to avoid equitable estoppel. (Cf. *Gonzalez, supra*, 107 Cal.App.5th at p. 127 [plaintiff could not avoid equitable estoppel by omitting mention of the underlying employment agreement on which the claims depend].) The artful pleading doctrine prevents plaintiffs from avoiding some unwanted legal consequence by *mischaracterizing the nature* of the claim they are asserting. (See, e.g., *Baral v. Schnitt* (2016) 1 Cal.5th 376, 392; *Central Pathology Service Medical Clinic, Inc. v. Superior Court* (1992) 3 Cal.4th 181, 191; *Palomar Health v. National Nurses United* (2023) 97 Cal.App.5th 1189, 1203; *Thomson v. Canyon* (2011) 198 Cal.App.4th 594, 606; *Felton v. Schaeffer* (1991) 229 Cal.App.3d 229, 239.) A decision to forgo certain claims or to limit the period for which relief is sought does not fall into that category. (See *Hernandez v. Meridian Management Services, LLC* (2023) 87 Cal.App.5th 1214, 1219 [equitable estoppel did not apply where the plaintiff declined to sue the company with which she had an arbitration agreement and named only functionally related firms for which she also worked].)

17

exclude "any workers staffed with [Redwood] by a third party while those workers were on assignment with [Redwood]" (while including "individuals, such as [Toothman], who were both direct employees and non-direct/staffed workers of [Redwood] at different periods of time," but only for the time they were direct employees of Redwood ). Redwood cites no authority in support of its contention that the amendment was "essentially an admission that the Arbitration Agreement governs the relationship with Redwood and that Toothman's claims are founded in and intertwined with that relationship." Like the Complaint, the original pleading alleged claims arising only from Toothman's direct employment with Redwood, after he had left Apex. A class amendment presumably designed to avoid *other* possible arbitration agreements involving *other* possible employees does not constitute an admission that Toothman's claims—on his own behalf or on behalf of the class—are founded in or intertwined with the Arbitration Agreement.

## DISPOSITION

The order denying Redwood's motion to compel arbitration is affirmed. Toothman is entitled to recover his costs on appeal.

GOLDMAN, J.

WE CONCUR:

BROWN, P. J.
STREETER, J.

18

| | |
|---|---|
| Trial Court: | Sonoma County Superior Court |
| Trial Judge: | Honorable Christopher M. Honigsberg |
| Counsel for Defendant and Appellant: | Seyfarth Shaw, Michele J. Beilke, Julia Y. Trankiem, Steven A. Morphy |
| Counsel for Plaintiff and Respondent: | Blumenthal Nordrehaug Bhowmik De Blouw, Norman B. Blumenthal, Kyle R. Nordrehaug |